932 So.2d 1054 (2006)
Bobby RALEIGH, Appellant,
v.
STATE of Florida, Appellee.
Bobby Raleigh, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC03-710, SC03-2282.
Supreme Court of Florida.
June 1, 2006.
*1056 Ryan Thomas Truskoski, P.A., Orlando, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Kenneth S. Nunnelley, Sr., Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
Bobby Raleigh pled guilty to two counts of first-degree murder and was subsequently sentenced to death. We affirmed his sentences on direct appeal. Raleigh v. State, 705 So.2d 1324 (Fla.1997), cert. denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998). Raleigh now appeals an order of the circuit court denying his motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851. He also petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the circuit court's order and deny the habeas petition.

I. FACTUAL AND PROCEDURAL BACKGROUND
In the early morning hours of June 5, 1994, while at the Club Europe in DeLand, Domingo Figueroa told his cousin, Bobby Raleigh, that someone had slapped his *1057 mother, Janice Figueroa.[1] Raleigh and Figueroa confronted Douglas Cox and his brother. While they were talking in the parking lot, Raleigh's mother ran out of the bar screaming at Cox. Raleigh took his mother to the car and returned to confront Cox. Raleigh apologized to Cox for his mother's actions and they shook hands. After confronting Cox, Raleigh obtained guns from his home, and he and Figueroa drove to Cox's trailer.
Raleigh went to the door of the trailer with a gun in his hand and asked about Cox. He was told that Cox was asleep. Raleigh and Figueroa left Cox's trailer, drove down a nearby dirt road, and parked. They returned and entered Cox's trailer carrying guns. Raleigh went to the end of the trailer and shot Cox in the head three times at close range. Figueroa and Raleigh each shot Cox's roommate, Tim Eberlin, until their guns jammed. Raleigh then beat Eberlin in the head with the barrel of his gun until Eberlin stopped screaming.
Raleigh and Figueroa next drove to Raleigh's home where they burned their clothes and dumped bullets into a neighbor's yard. They later hid the guns in a secret compartment in Raleigh's Subaru. The police went to Raleigh's house that night, and he agreed to talk to them. Raleigh initially denied his involvement in the murders, but after being told that Figueroa had implicated him, he made a second statement, which was taped. In this second statement, Raleigh admitted killing both Cox and Eberlin.
Raleigh was charged with two counts of first-degree murder, one count of burglary, and one count of shooting into a building. He entered into a plea agreement with the State in which he agreed to plead guilty to both counts of murder and, in exchange, the State agreed to nolle prosequi the counts of burglary and shooting into a building. The court accepted Raleigh's plea pursuant to this agreement on June 6, 1995. Figueroa was tried and sentenced separately.
Raleigh's penalty phase proceeding was conducted in August 1995. Figueroa was not called to testify. Instead, a prior taped statement Figueroa had given to police investigator Lawrence Horzepa on the day of the murders was introduced through Horzepa. Initially, through a series of leading questions during cross-examination, Raleigh's counsel asked Horzepa to confirm specific portions of Figueroa's statement. Specifically, defense counsel asked Horzepa to confirm that Figueroa had told him that his "Aunt Janice" (Raleigh's mother) had been called a bad name by the victim, Cox, and to confirm that Figueroa admitted to owning the safe that contained the guns. On its redirect examination of Horzepa, the State sought to introduce Figueroa's entire statement by playing the tape. Defense counsel stated that the defense had no objection. When the tape was played, the jury heard Figueroa say that he shot Eberlin once at Raleigh's direction, but Figueroa was not sure if his shot hit Eberlin. The jury also heard Figueroa say that Raleigh had already shot Eberlin once.
Raleigh testified on his own behalf at the penalty phase. In addition to eight other witnesses, defense counsel called psychologist Dr. James Upson as its mental health expert. Dr. Upson testified that he met with Raleigh for approximately eleven and a half hours, interviewed Raleigh's mother for approximately one hour, reviewed Raleigh's school and medical records, and conducted twenty tests. Dr. Upson found Raleigh to be of normal *1058 intelligence with an IQ of ninety-eight. He further testified that Raleigh is a follower who is easily manipulated by others and that Raleigh portrayed some allegiance to Figueroa. Dr. Upson testified that Raleigh fit the criteria for antisocial personality, although Dr. Upson would not clinically diagnose Raleigh with a personality disorder. Dr. Upson further testified that Raleigh's neuropsychological functions may have been impaired by the consumption of alcohol at the time of the murders, but there was no significant impairment. Ultimately, Dr. Upson concluded that he could not find any statutory mitigators to apply in Raleigh's case except Raleigh's age at the time of the murders (nineteen).
At the end of the penalty phase, the jury unanimously recommended the death penalty for Raleigh on both counts of first-degree murder. However, before Raleigh was sentenced, he learned that Figueroa had made another statement about his involvement in the crime. The day following the murder, Figueroa told his uncle that he had killed one victim and Raleigh killed the other. The State had introduced this statement at Figueroa's trial; and, during closing argument, the State had argued that this statement demonstrated that Figueroa had formed the intent to kill Eberlin, regardless of whether Figueroa was the one who actually killed Eberlin. The State argued that this statement, coupled with the forensic evidence that two of the three shots which hit Eberlin may have been fired from Figueroa's gun, demonstrated that Figueroa had downplayed his role in the murders when he gave the statement to investigator Horzepa.
On February 16, 1996, Raleigh was sentenced to death upon the trial court's finding that the five statutory aggravators[2] outweighed the one statutory and several nonstatutory mitigators.[3] On direct appeal, Raleigh raised fourteen claims.[4] After *1059 denying each claim, this Court affirmed Raleigh's death sentence. Raleigh, 705 So.2d at 1331. Raleigh then filed an amended 3.851 motion for postconviction relief, in which he raised fourteen claims. On August 2, 2001, the trial court held a Huff[5] hearing and ordered an evidentiary hearing on seven of Raleigh's claims.[6]
At the evidentiary hearing, Raleigh presented the testimony of a second mental health expert, Dr. Ernest Bordini. Dr. Bordini diagnosed Raleigh as suffering from a nondescript neuropsychological dysfunction. Dr. Bordini further testified that several statutory mitigators applied, including that Raleigh was acting under the dominion and control of Figueroa. The trial court denied relief. Raleigh now appeals the trial court's denial as it relates to five of his claims.[7] He also petitions this Court for a writ of habeas corpus.

II. RULE 3.851 MOTION FOR POSTCONVICTION RELIEF
As to Raleigh's appeal of the denial of his motion for postconviction relief, we first address his claim that his mental health evaluation was inadequate under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). We then address three claims alleging ineffective assistance of counsel. Those claims are that counsel provided ineffective assistance by (1) failing to adequately prepare the mental health expert's testimony; (2) failing to object to the admission of Figueroa's taped statement; and (3) counseling Raleigh to plead guilty to two counts of first-degree murder. We then consider the claim that the State knowingly presented false testimonial evidence in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Lastly, we address the assertion that the State violated Raleigh's right to due process under Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), by taking inconsistent positions in Raleigh's and Figueroa's trials regarding the identity of the principal actor in the murder of Eberlin. For the reasons stated below, we affirm the trial court's denial of these claims.

*1060 A. Ake Claim
Raleigh contends that he did not receive adequate mental health assistance as required by Ake. "Ake requires that a defendant have access to a `competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.'" Mann v. State, 770 So.2d 1158, 1164 (Fla. 2000) (quoting Ake, 470 U.S. at 83, 105 S.Ct. 1087). Because an Ake-type claim rests on a denial of a defendant's right to due process and equal protection under the Fourteenth Amendment, 470 U.S. at 76, 105 S.Ct. 1087, it generally is procedurally barred on postconviction review because it should have been presented on direct appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla.2003); Moore v. State, 820 So.2d 199, 203 n. 4 (Fla.2002); Cherry v. State, 781 So.2d 1040, 1047 (Fla. 2000). A narrow exception to this general procedural bar was carved out by this Court in State v. Sireci, 502 So.2d 1221, 1223 (Fla.1987).
In Sireci, this Court affirmed the trial court's finding that a limited postconviction evidentiary hearing was necessary to address the defendant's claim that he "was deprived of his rights to due process and equal protection" because, based upon the findings of a third psychiatrist, there was evidence that Sireci's two court-appointed psychiatrists failed to conduct competent and appropriate evaluations by missing the signs of psychosis and organic brain damage. Id. This procedural exception was based upon the recognition that a new sentencing hearing is required "in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage." Id. at 1224 (citing Mason v. State, 489 So.2d 734 (Fla.1986)). More recently, we elaborated on this concern by stating that "one of the most compelling indications for granting an evidentiary hearing on an Ake claim [raised in a motion for postconviction relief] occurs when one or more of a defendant's mental health experts `ignore[s] clear indications of either mental retardation or organic brain damage.'" Jones v. State, 845 So.2d 55, 68 (Fla.2003) (affirming trial court's denial of evidentiary hearing on Ake claim) (quoting Sireci, 502 So.2d at 1224).
Relying on Sireci, the trial court considered the merits of Raleigh's Ake claim and denied it. The trial court ultimately concluded that Raleigh received a professional, competent, and appropriate mental health evaluation for use in aid of his defense. The trial court found that relief was not warranted because Dr. Upson did not miss signs of mental retardation or organic brain damage. In addition, the trial court found that Dr. Bordini's evaluation of Raleigh was simply a more favorable repackaging of Dr. Upson's evaluation, not a demonstration that Dr. Upson's evaluation was inadequate.
These findings are supported by competent, substantial evidence. Dr. Bordini's testimony did not establish that Dr. Upson missed any clear indications of mental retardation or organic brain damage, thereby rendering Dr. Upson's evaluation "grossly insufficient" under Sireci. Both experts concluded that Raleigh does not have brain damage. In addition, neither Dr. Upson nor Dr. Bordini found Raleigh to be mentally retarded; both found his IQ to be ninety-eight.[8] Based on this record, *1061 the trial court correctly concluded that relief was not warranted under Sireci.
The trial court's additional finding, that Dr. Bordini's evaluation is essentially no more than a better repackaging of Dr. Upson's evaluation, is also supported by the record.[9] While Dr. Bordini gave a number of reasons why he believed Dr. Upson's evaluation was inadequate,[10] his testimony did not establish that Dr. Upson had failed to perform the essential tasks required under Ake. Both experts spent a comparable amount of time interviewing Raleigh and his mother, Janice Figueroa, and both reviewed Raleigh's medical and school records. Each expert administered a plethora of tests aimed at essentially the same four major areas: intellectual functioning, achievement, neuropsychological functioning, and personality. As the trial court noted, the results of both experts' testing are substantially similar. Both discovered as follows:
[Raleigh] had symptoms of depression; had difficulty differentiating between fantasy and reality; is insecure; [is] passive, dependent, a follower; has a close relationship with his mother; had attempted suicide; is remorseful; tends to act before thinking; fits criteria for anti-social personality, even though that may not be his diagnosis; the use of alcohol on the night of the murders may have impacted his neuro-psychological function; [Raleigh] was only nineteen (19) years old at the time of the murders; and showed some allegiance to Domingo Figueroa.
(Citations omitted.) Although Dr. Bordini focused more on Raleigh's neuropsychological functioning through the administration of the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) [DSM IV] test,[11] this testing did not reveal anything *1062 that undermined the adequacy and appropriateness of Dr. Upson's earlier evaluation. Ultimately, other than learning some additional facts that Raleigh did not share with Dr. Upson regarding his upbringing and sexual abuse,[12] Dr. Bordini's evaluation was substantially similar to Dr. Upson's.
In light of the foregoing, we affirm the trial court's conclusions that Dr. Upson did not miss signs of mental retardation or organic brain damage and that Raleigh in fact received a professional, competent, and appropriate mental health evaluation[13] for use in aid of his defense.[14]

B. Ineffective Assistance of Counsel
Raleigh's next three claims allege ineffective assistance of counsel. When considering claims of ineffective assistance of counsel, this Court applies the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation `fell below an objective standard of reasonableness.'" Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052); see also Hodges v. State, 885 So.2d 338, 345-346 (Fla.2004) (stating and applying Strickland standard). The prejudice prong of the analysis "requires showing that counsel's *1063 errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Failure to establish either prong results in a denial of the claim. Ferrell v. State, 918 So.2d 163, 170 (Fla.2005). When reviewing these claims, we defer to the trial court's findings of fact regarding the credibility of witnesses and the weight assigned to the evidence, but we review the performance and prejudice prongs de novo. Windom v. State, 886 So.2d 915, 921 (Fla.2004) (citing Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999)). Raleigh has not satisfied the Strickland standard in any of his three ineffective assistance of counsel claims.

(1) Failure to Adequately Prepare Mental Health Expert Testimony
First, Raleigh claims that defense counsel was ineffective for failing to adequately prepare the testimony of Dr. Upson at the penalty phase proceeding. In support of this argument, Raleigh points to the testimony the State elicited on cross-examination from Dr. Upson about Dr. Upson's lack of knowledge regarding the facts surrounding the crime scene and criminal episode.[15] The thrust of Raleigh's claim is that his penalty phase presentation was undermined by Dr. Upson's lack of credibility and that his sentence is, therefore, unreliable.
However, even assuming a deficiency in performance, Raleigh has failed to establish prejudice. He has not established that Dr. Upson's testimony would have been more favorable or materially more credible if Dr. Upson had been provided with these facts. At the penalty phase proceeding, Dr. Upson testified that he was comfortable with his opinion and that he was not sure if additional facts would change it.[16] Moreover, Dr. Upson was not called to testify at the evidentiary hearing to establish that the additional facts would indeed have changed his opinion. Thus, based on the record, Raleigh has failed to establish prejudice, and we affirm the denial of this claim. See Ferrell, 918 So.2d at 170.

(2) Admission of Figueroa's Taped Statement
Second, Raleigh argues that he was prejudiced by defense counsel's failure to object to the State's introduction of Figueroa's taped statement on its redirect examination of police investigator Horzepa. As noted earlier, investigator Horzepa testified to a portion of the statement Figueroa made to him during defense counsel's cross-examination. On redirect, the State introduced the entirety of Figueroa's statement by playing the tape itself. When this statement was played, the jury heard Figueroa say that Raleigh directed him to shoot Eberlin. Raleigh claims that "the statement cast doubt on [Raleigh's] veracity as a witness, strengthened the State's argument that the cold, calculated, and premeditated [CCP] aggravator applied, and weakened [his] mental health mitigation," particularly the "under substantial domination of another" mitigator.
*1064 It is not clear whether Raleigh claims that defense counsel was ineffective for failing to object to the State's introduction of the entirety of Figueroa's statement or that defense counsel was ineffective for opening the door to the statement in the first instance. Thus, we address both aspects. We find that both arguments are without merit.
If Raleigh's claim is that counsel was ineffective for failing to object to the State's admission of the entire statement on its redirect of investigator Horzepa, defense counsel cannot be deemed deficient for failing to make a meritless objection. Defense counsel introduced portions of Figueroa's statement during the cross-examination of investigator Horzepa. Once defense counsel opened the door, under the facts and circumstances of this case, the doctrine of completeness permitted the State to introduce the remainder of Figueroa's statement. See § 90.108(1), Fla. Stat. (1997) ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously."); see also Thompson v. State, 648 So.2d 692, 695 (Fla.1994) (finding no error where defense counsel invited hearsay statements during questioning of state's witness). Therefore, defense counsel was not deficient for making a meritless objection.
In its order, the trial court addressed the second aspect. It considered this claim to be that defense counsel was ineffective for opening the door to the introduction of Figueroa's entire statement by introducing a portion of Figueroa's statement during the cross-examination of investigator Horzepa. In denying this claim, the trial court found that this claim "amounts to nothing more than disagreement with defense counsel's strategy and is insufficient in light of the testimony at the evidentiary hearing." This finding is supported by the record.
The record establishes that defense counsel made an informed and reasoned, strategic decision to introduce Figueroa's taped statement after considering the alternatives. As summarized in the trial court's order, the testimony of defense counsel was that:
[Defense counsel] did not want [Figueroa] to testify personally at [Raleigh's] penalty phase proceeding because they would not have any control over what he testified to. They believed his live testimony may have been more damaging than his recorded statement. Instead, they preferred that the statement come in because parts of it could be used to support Defendant's case, i.e., to show the control or influence [Figueroa] had over [Raleigh].
Thus, rather than call Figueroa to the stand, counsel decided to introduce the beneficial portions of Figueroa's statement through the cross-examination of investigator Horzepa.
"[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Stewart v. State, 801 So.2d 59, 65 (Fla.2001) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). "Reasonable strategic decisions of trial counsel should not be second-guessed by a reviewing court." Jones v. State, 845 So.2d 55, 65 (Fla.2003) (citing Strickland, 466 U.S. at 689-91, 104 S.Ct. 2052). Raleigh has not demonstrated that defense counsel's decision to introduce Figueroa's statement fell outside the norms of professional *1065 conduct. Therefore, we affirm the denial of this claim.

(3) Recommendation to Plead Guilty to Two Counts of First-Degree Murder
Third, relying on Delgado v. State, 776 So.2d 233 (Fla.2000), Raleigh alleges that defense counsel was ineffective for recommending that he plead guilty to two counts of first-degree murder. The trial court denied this claim, in part, because Delgado does not apply retroactively and is, therefore, inapplicable. We agree.
Indeed, Delgado does not apply retroactively. Although we expressly receded from Raleigh[17] in Delgado, we specifically held that Delgado did not apply retroactively to convictions which had already become final. Id. at 241 (citing Witt v. State, 387 So.2d 922, 928-31 (Fla.1980)). Raleigh's sentence became final in 1998, well before Delgado was decided in 2000. As the trial court properly noted, "there is no reason to conclude that [Raleigh's] attorneys were ineffective for failing to foresee the result in Delgado." Therefore, we affirm the trial court's denial of this aim.

C. Giglio and Stumpf Claims
Raleigh's final two claims challenge the State's differing uses of Figueroa's pretrial statements between the trial of Raleigh and the trial of Figueroa. The first of these two claims alleges that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by presenting testimony it knew was false.
To establish a claim under Giglio, the defendant must prove (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Suggs v. State, 923 So.2d 419, 426 (Fla.2005). In reviewing this claim, we defer to the trial court's findings of fact but independently determine whether the facts are sufficient to establish the elements required in each claim. Id.
The thrust of Raleigh's Giglio claim is that, at his trial, the State only introduced Figueroa's statement to investigator Horzepa without mentioning or introducing the statement Figueroa made to his uncle. Because Figueroa's statement to his uncle arguably contradicts portions of his statement to investigator Horzepa, Raleigh claims that the State knowingly presented false testimony. Raleigh has not established that Figueroa's statement to investigator Horzepa was false, much less that the State knew it was false. Therefore, this claim is without merit.
Raleigh's second related claim is that the State violated his right to due process under Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005), by taking inconsistent positions in Raleigh's and Figueroa's trials as to the identity of the principal actor in the murder of Eberlin.[18] At Raleigh's penalty phase, the prosecutor argued that Raleigh was the principal actor in the murder of both victims. This argument was not materially inconsistent with Figueroa's statement to investigator Horzepa that Raleigh had killed both victims. However, during closing argument at Figueroa's trial (at which both of Figueroa's statements were introduced into evidence), the prosecutor commented upon the conversation between Figueroa and his uncle as follows:
["]Hey, man, tell me what you did. Tell me what you did,["] [Figueroa's uncle] said. ["]Tell me.["] This is the next day, if you remember. Finally, [Figueroa] *1066 says, ["]man, it was really bad. It was bad. I killed one and Bobby killed one.["] It doesn't sound like there is a whole lot of hesitation that I might have killed one or it's possible that I killed one or I am not sure if I killed one. I mean, he told his uncle the truth. I killed one and Bobby killed one.
Raleigh claims that this argument is an assertion that Figueroa, not Raleigh, actually killed Eberlin. Relying on Stumpf, Raleigh asserts that due process precludes the State from taking such an inconsistent position.
In Stumpf, the state first tried Stumpf under the theory that he was the principal actor in the shooting death of the victim. Id. at 2403-04. Then, based upon new evidence that came to light after Stumpf had been tried and convicted, the state tried Stumpf's codefendant under the inconsistent theory that the codefendant was the principal actor in the shooting death of the same victim. Id. The United States Supreme Court held that the use of such inconsistent theories warranted remand to determine what effect this may have had on Stumpf's sentence and to determine whether the death penalty violated due process. Id. at 2407-08.
No such due process concerns are present in this case. Unlike the situation in Stumpf, the State did not first try Raleigh as the principal actor in Eberlin's murder and then inconsistently prosecute Figueroa as the principal actor in the same death. Instead, the State argued consistently in both trials that Raleigh was a principal actor in the death of Eberlin. The difference in Figueroa's trial was that, using Figueroa's second statement to his uncle, the prosecutor argued that Figueroa played a greater role in the crime than he had admitted in his statement to investigator Horzepa. In particular, the prosecutor argued that Figueroa's statement to his uncle (consistent with the forensic evidence) established that Figueroa had formed the necessary intent in Eberlin's death to be convicted of first-degree murder. The essence of this argument was that Figueroa was no less culpable for the murder of Eberlin than Raleigh.
Specifically, the prosecutor began his closing argument in Figueroa's trial by reading the definition of killing with premeditation and presenting to the jury this theory: "Whether or not [Figueroa] actually was the one who killed him doesn't matter. The fact of the matter is what was his intent at the time. The intent was to kill Mr. Eberlin." To support this theory, the prosecutor argued that Figueroa may have shot at Eberlin two times, giving him time to reflect while shooting Eberlin.[19] The prosecutor acknowledged that "[y]ou can argue this evidence as far as how the shots took place to your heart's content. There's a zillion ways that could have happened." It was in this context that the prosecutor argued that Figueroa's statement to his uncle demonstrated that he had formed the intent to kill Eberlin.
*1067 To summarize, the State did not take an inconsistent position as the prosecution did in Stumpf. In Figueroa's trial, the State never contradicted the position it took at Raleigh's trial regarding Raleigh's culpability. It did not change course by seeking to prove that Figueroa, not Raleigh, was the principal actor in Eberlin's death. Therefore, the due process concerns raised in Stumpf do not apply.
Accordingly, we affirm the trial court's denial of Raleigh's Giglio claim and deny relief on his Stumpf claim.

III. PETITION FOR WRIT OF HABEAS CORPUS
Having affirmed the trial court's denial of Raleigh's 3.851 motion, we now consider Raleigh's petition for writ of habeas corpus. In his petition, Raleigh raises two claims, both essentially arguing that Florida's capital sentencing statute is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). As both the United States Supreme Court and this Court have recently recognized, Ring does not apply retroactively. Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (holding that Ring does not apply to cases which are already final on review); Johnson v. State, 904 So.2d 400, 412 (Fla. 2005). Raleigh's appeal was final in 1998 when the United States Supreme Court denied certiorari. See Raleigh v. State, 705 So.2d 1324 (Fla.1997), cert denied, 525 U.S. 841, 119 S.Ct. 105, 142 L.Ed.2d 84 (1998). Therefore, we deny Raleigh's habeas petition.

IV. CONCLUSION
For the reasons set forth above, we affirm the trial court's denial of Raleigh's motion for postconviction relief, and we deny his petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The facts are taken from Raleigh's direct appeal. Raleigh, 705 So.2d 1324.
[2] The aggravating circumstances found by the trial judge were: (1) prior violent felony (applied to both Cox and Eberlin); (2) that the murders were committed while engaged in a burglary (applied to the murders of both Cox and Eberlin); (3) that the murder of Cox was cold, calculated, and premeditated (CCP); (4) that the murder of Eberlin was committed to avoid arrest or effect escape; and (5) that the murder of Eberlin was especially heinous, atrocious, or cruel (HAC). Raleigh, 705 So.2d at 1327 n. 1.
[3] The trial court found one statutory and fifteen nonstatutory mitigators. The statutory mitigator is Raleigh's agehe was nineteen at the time of the crime. Id. at 1327 n. 2. The nonstatutory mitigators were that the defendant (1) was intoxicated; (2) was remorseful; (3) pled guilty; (4) offered to testify against codefendant Figueroa; (5) could probably adjust well to prison life; (6) was a good son and friend to his mother; (7) was a good brother; (8) was a good father figure to ex-girlfriend's daughter; (9) was born into dysfunctional family; (10) did not know who fathered him; (11) attempted suicide; (12) had low self-esteem; (13) suffered from an adjustment disorder and was antisocial; (14) used poor judgment and engaged in impulsive behavior; and (15) was a follower. Id. at 1327 n. 3.
[4] Raleigh alleged the trial court erred in (1) failing to instruct the jury on the "no significant history of criminal activity" statutory mitigator; (2) instructing the jury on the "pecuniary gain" aggravator; (3) failing to give the requested instruction on the CCP aggravator; (4) dismissing a juror over defense objection where there was no showing that the juror could not be fair; (5) finding the "during the course of a burglary" aggravator; (6) finding the "avoid arrest" aggravator; (7) finding the CCP aggravator for Cox's murder; (8) finding the HAC aggravator for Eberlin's murder; (9) rejecting the "under substantial domination of another" statutory mitigator; (10) rejecting the "no significant history of criminal activity" statutory mitigator; (11) giving only "some weight" to the "remorseful and cooperative with authorities" nonstatutory mitigator; (12) rejecting Figueroa's life sentences as a nonstatutory mitigator; (13) giving "little weight" to Raleigh's voluntary intoxication; and (14) sentencing Raleigh to death because death is disproportionate. Id. at 1327 n. 4. For each of the fourteen issues, this Court found that either the trial court committed no error or that the claim lacked merit. Id. at 1327-31.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] The court granted an evidentiary hearing on the following claims: (1) penalty phase defense counsel was ineffective for failing to object to the admission of the codefendant's taped statement in violation of section 921.141(1), Florida Statutes (1995); (2) the State knowingly presented false evidence in violation of defendant's rights under the United States Constitution and the Florida Constitution; (3) defendant was deprived of his rights because the mental health expert who evaluated defendant did not render adequate mental assistance as required by Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (4) defense counsel was ineffective for failing to adequately investigate and present mitigation and to adequately challenge the State's case; (6) defense counsel was ineffective for recommending that the defendant plead guilty to first-degree murder; (9) defense counsel was ineffective for recommending that defendant accept the plea based on their prediction of a life sentence from the judge; and (11) defense counsel was ineffective for advising defendant that in exchange for his plea, he would receive a nonjury sentencing phase proceeding or a jury override.
[7] Raleigh does not challenge the trial court's denial of his claim that defense counsel was ineffective for recommending that defendant accept the plea based on their prediction of a life sentence from the judge or his claim that defense counsel was ineffective for advising defendant that, in exchange for his plea, he would receive a nonjury sentencing phase proceeding or a jury override.
[8] Dr. Bordini testified that Raleigh had an IQ of ninety-eight, was not mentally retarded, and relied upon visual information more than language, giving visual signals more weight. The trial court correctly notes that Dr. Upson made similar findings:

[Raleigh] is an individual who academically falls in the normal range; his linguistic skills are lower than his visual spatial skills, which means that he will be prone to handle learning and frustrating situations more in terms of action than in terms of reflective thought; his ability to achieve is within what one would predict from his ability; [he has] no significant neuro-psychological deficiencies with the exception of some difficulty in judgment, particularly where conceptual processes are involved . . . .
[9] The weight accorded by the trial court to Dr. Bordini's findings will not be disturbed on appeal. See Rutherford v. State, 727 So.2d 216, 224 & n. 4 (Fla.1998) (finding trial court was within its discretion to discount more favorable mental health evaluation conducted six and ten years after the murders at issue).
[10] As accurately summarized by the trial court, Dr. Bordini alleged that Dr. Upson's evaluation was deficient because

Dr. Upson (1) was unaware of critical family history and witness statements, yet [Dr. Bordini] admitted that Defendant simply refused to discuss his sexual abuse at the time of the penalty phase proceeding; (2) failed to adequately understand Defendant's behavior before the murders; (3) did not have enough information about domination to adequately testify to it; (4) erred by failing to work with a diagnosis; (5) administered and scored the MMPI test wrong (Dr. Bordini could not replicate the results); (6) failed to administer a formal memory test; and (7) he failed to fully explore the effects of alcohol on Defendant's judgment and motor function on the night of the murders.
[11] Dr. Upson did not administer the DSM IV test. The results from Dr. Bordini's administration of the DSM IV test were adequately summarized by the trial court as follows:

Dr. Bordini first noted some frontal lobe difficulties, but he did not elaborate. Using DSM IV, Dr. Bordini made a diagnosis of Defendant. As to Axis I, he noted a cognitive disorder not otherwise specified, which he described as neuropsychological dysfunction directly related to developmental factors and frequent freon inhalation; a communication disorder not otherwise specified; depression; posttraumatic stress disorder; and an anxiety disorder not otherwise specified. As to Axis II, he noted borderline personality disorder; dependant personality disorder (subserves his needs to others); and features of antisocial personality disorder. As to Axis III, Dr. Bordini noted that Defendant had chronic hip and hand pain.
[12] The trial court noted that

Dr. Bordini relayed a history of Defendant which included: he did not know who his natural father was, yet he suspected that his father was his maternal uncle; his mom was fifteen (15) years old when she gave birth to Defendant; he witnessed physical abuse and was sexually abused himself, as early as age four; he felt alienated from his stepfather; he witnessed his stepfather abuse his mom; he used drugs and alcohol, and huffed freon; attempted suicide; had bisexual feelings; and dealt drugs.
(Footnote omitted.) Although he was not aware of the sexual abuse, Dr. Upson's findings also noted that Raleigh has trouble with traditional sexual roles. Furthermore, as the trial court also noted, neither Dr. Upson nor defense counsel can be faulted for the defendant's own reluctance to discuss his prior sexual abuse with Dr. Upson.
[13] Within his Ake claim, Raleigh also alleges that defense counsel failed to obtain a professional, competent, and appropriate mental health evaluation by virtue of either Dr. Upson's failure to provide an adequate and appropriate evaluation or counsel's failure to provide the background material necessary for an adequate and appropriate evaluation. We note that because these claims focus on defense counsel's alleged deficiencies rather than the deficiencies of his mental health expert, they are properly analyzed under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To the extent that Raleigh is claiming that defense counsel was ineffective for failing to obtain an adequate mental health evaluation, this claim is without merit because, as demonstrated here, Dr. Upson's evaluation was not inadequate. However, to the extent that Raleigh is claiming that defense counsel was ineffective for failing to adequately prepare the testimony of Dr. Upson by failing to provide the necessary background information, we address the merits of this argument in the next section.
[14] We also note that Dr. Upson's testimony helped the defendant establish one statutory mitigator and at least seven of the fifteen nonstatutory mitigators. The statutory mitigator was Raleigh's agehe was nineteen at the time of the crime. The nonstatutory mitigators Dr. Upson's testimony helped to establish were: (1) was intoxicated; (2) was remorseful; (11) attempted suicide; (12) had low self-esteem; (13) suffered from an adjustment disorder and was antisocial; (14) used poor judgment and engaged in impulsive behavior; and (15) was a follower. See supra note 3.
[15] On cross-examination, the State elicited testimony from Dr. Upson in which Dr. Upson acknowledged that, apart from the information contained in the indictment and what was relayed to him by Raleigh, he knew very little of the criminal episode; that he had "requested the facts of the case and got some"; and that he had not been asked to evaluate the crime scene.
[16] On cross-examination, when asked by the State whether specific additional facts regarding the crime scene would change his opinion, Dr. Upson only responded that they might but that he would have to review them.
[17] 705 So.2d 1324 (Fla.1997).
[18] Raleigh raised this claim at oral argument after filing a notice of supplemental authority.
[19] The prosecutor stated:

In fact, I would submit to you it's easy to show by the evidence that [Figueroa] probably tried to pull the trigger at least one other time. Now, whether it was between the first and second shot or after the second shot, we don't have any evidence to that fact. We do know that that the bullet had to be cleared and it landed right at his feet. That all shows the conscious intent. The reflection. A premeditated murder can be done in a twinkling of any eye as long as you have the conscious intent and reflect about it just a second and I submit that when you point a gun, when you pick it up and point it in a direction in that pointblank little room and fire it, you fire it not once but twice and perhaps try to squeeze a third round, that all shows obviously the intent to kill.