# Supreme Court of Florida

_____

No. SC12-629
_____

**LAMAR Z. BROOKS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-706
_____

**LAMAR Z. BROOKS,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 7, 2015]

PER CURIAM.

Lamar Brooks appeals an order of the circuit court that denied his initial motion to vacate his convictions of first-degree murder and sentences of death filed pursuant to Florida Rule of Criminal Procedure 3.851. He also petitions this Court

for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla.

Const. As explained below, we affirm the postconviction court's denial of relief

on all claims and deny Brooks' petition for a writ of habeas corpus.

**FACTS AND BACKGROUND**

Lamar Brooks was convicted and sentenced to death for the first-degree

murders of Rachel Carlson and her three-month-old daughter, Alexis Stuart.

Brooks v. State, 918 So. 2d 181, 186-87 (Fla. 2005) (Brooks II). However, this

Court reversed Brooks' convictions and sentences on direct appeal, concluding that

the trial court erroneously admitted extensive inadmissible hearsay testimony that

prejudicially impacted Brooks' trial. Brooks v. State, 787 So. 2d 765, 781-82 (Fla.

2001) (Brooks I). Upon retrial, Brooks was again convicted of the murders of

Carlson and Stuart. Brooks II, 918 So. 2d at 187. A jury recommended a sentence

of death by a vote of nine to three for the murder of Carlson and eleven to one for

the murder of Stuart, and the trial court again sentenced Brooks to death for both

murders. Id. This Court affirmed Brooks' convictions and sentences on direct

appeal. Id. at 211. The portions of the opinion relevant to the facts of the murders

are as follows:

> In the late night hours of April 24, 1996, Rachel Carlson and
> her three-month-old daughter, Alexis Stuart, were found stabbed to
> death in Carlson's running vehicle in Crestview, Florida. Carlson's
> paramour, Walker Davis, and Brooks were charged with the murders.
> Davis was married and had two children, and his wife was pregnant

with their third child. However, the victim believed Davis was also the father of her child and demanded support from him. [n.1] Davis became concerned about this pressure. He was convicted of the murders and sentenced to life imprisonment. However, he did not testify at Brooks' trial.

> [N.1.] DNA tests performed after the murders revealed that Davis was not the father [of Stuart].

Brooks lived in Pennsylvania but had traveled to Florida from Atlanta with his cousin Davis and several friends on Sunday, April 21, 1996. Brooks stayed with Davis at Eglin Air Force Base for a few days before returning to Pennsylvania. In interviews with the police, he informed them that on the following Wednesday evening, the night of the murders, he helped Davis set up a waterbed, watched some movies, and walked Davis's dog. Contrary to Brooks' statements, several witnesses placed him and Davis in Crestview on the night of the murders, although no physical or direct evidence linked him to the crimes.

. . . .

[D]uring this trial, Mark Gilliam related detailed, substantiated information regarding the two failed attempts he, Brooks, and Davis had made on Carlson's life. Gilliam testified that on Monday, April 22, 1996, Davis phoned Carlson from the hospital asking her to meet him at his home where Gilliam and Brooks were secretly waiting in Gilliam's car. According to Gilliam, he and Brooks followed the vehicle occupied by Davis and Carlson in the direction of the predesignated place in Crestview where, according to plan, Brooks was to shoot Carlson. Gilliam established that Brooks had a pistol-grip shotgun and latex gloves with him in the car. Gilliam's version of events was partially corroborated by the testimony of a law enforcement officer who performed a consensual search of Davis's home after the murders and discovered a short-handled shotgun. In addition, the crime scene analyst testified that the smudged hand impressions found at the crime scene were consistent with the perpetrator wearing latex gloves.

Gilliam further testified that during the course of the duo following Carlson's car on the night of the first failed murder attempt,

Carlson was stopped by a law enforcement officer for speeding. Gilliam explained that he drove by Carlson's stopped car, made two u-turns, and pulled up a short distance behind her. This testimony was partially corroborated by that of Florida State Trooper Michael Hulion, who reported that he stopped Carlson for speeding on Monday, April 22, and noted the presence of a baby in the back seat as well as a black male in the passenger seat. Gilliam further described that as this was occurring a second police officer drove to a position behind his vehicle, approached his car, and began questioning the two men as to why they had positioned their vehicle behind Carlson's stopped vehicle. Testimony at trial confirmed that a sheriff's deputy had in fact run a check on Gilliam's license plates that evening in the vicinity of Crestview.

Gilliam also described in detail the second attempt to effectuate the murder, which occurred on the following day, Tuesday, April 23, and followed largely the same sequence of events with Carlson picking Davis up at a local shopping center and Gilliam and Brooks following behind. According to Gilliam, the second attempt ended in failure because Gilliam became separated from Carlson's car at a stop light. Gilliam stated that he and Brooks proceeded to the predesignated location in Crestview and waited for the plan to unfold, but Davis and Carlson did not appear. Gilliam's testimony was supported by the testimony of the officers who questioned Gilliam after the murders and related that he placed "Xs" on a map of Crestview that corresponded to the area in which the victims' bodies were found. Finally, Gilliam stated that he backed out of the murder plan and left Eglin the morning of April 24 to return to his base at Fort Benning, Georgia.

. . . .

Record evidence also firmly establishes Brooks' presence in Crestview in the vicinity of the crime scene in close proximity to the time of the murders. Witnesses Irving Westbrook and Charles Tucker testified that they saw two men walking in the vicinity of the murder scene, away from where Carlson's car was later found, around the time of the murder. According to Irving Westbrook, one of the men had a limp. Their testimony was corroborated by witness Kea Bess who had previously been introduced to Davis by a mutual friend on the Sunday prior to the murders. Bess testified that she saw Davis,

whom she recognized because of the cast on his leg, and another man walking rapidly in the opposite direction from the crime scene. According to Bess, one of the men was carrying a bag.

Witness [Melissa] Thomas testified that Davis and Brooks visited her Crestview apartment, located only a few blocks from the scene of the crime, on the night of the murders shortly after 9 p.m. She stated that both men were wearing black nylon pants and that Brooks carried a black backpack. Thomas testified that Brooks used the bathroom, Davis asked for a towel, and both men used the telephone. [n.10] The presence of Brooks and Davis in Thomas's apartment that evening was also corroborated by the testimony of Nikki Henry, a friend of Thomas, who arrived just as the two men were walking away from the location.

> [N.10] The presence of Brooks in the apartment was corroborated by the DNA found on a cigarette butt recovered from Thomas's ashtray which matched Brooks' DNA.

The presence of Brooks and Davis in Crestview on the night of the murders was further established and verified by the testimony of Rochelle Jones. Jones stated that she received a call from Davis on the night of the murders requesting that she come to a particular location to provide transportation for the duo. Davis gave Jones directions to drive to a street in Crestview between a credit union and an animal hospital. Jones's testimony was corroborated by telephone records, and the testimony of a police officer who stopped Jones for speeding as she drove back to Eglin Air Force base, who noted the presence of two black males in her vehicle and requested that Davis assume operation of the vehicle because Jones was operating the vehicle with a suspended license. The testimony of Jones was further corroborated by that of Glenese Rushing, who was using the automatic teller machine at the Crestview credit union on the night of the murders and reported seeing two people across the street at the animal hospital entering a car that subsequently made a u-turn in the credit union parking lot. The testimony of Jones also establishes that whatever transportation Brooks and Davis may have used to travel to Crestview that evening was apparently unavailable for the return trip.

Record evidence also demonstrates the guilty knowledge of Brooks regarding the murders. In contrast to the multitude of witnesses who placed Brooks in Crestview near the crime scene on the night of the murders, Brooks consistently denied being in the community during his police interviews. According to Air Force Office of Special Investigations Agent Karen Garcia, Brooks claimed that he and his cousin remained in Davis's apartment near Eglin Air Force base assembling a waterbed on the night of the murders, leaving only briefly to walk Davis's dog. At one point during his interview with Agent Garcia, Brooks stated, "Walker is on his own. If he did something, he's on his own." The investigator from the office of the State Attorney, Michael Hollinhead, also interviewed Brooks shortly after the murders. Hollinhead testified that when he attempted to develop information from Brooks regarding the person named "Mark" (subsequently identified as Gilliam), who had accompanied Brooks to Davis's home on April 21, Brooks became "evasive."

The identity of Brooks as the individual who killed Carlson and Stuart is also supported by substantial evidence. Forensic evidence established that both Carlson and Stuart were killed by a person seated in the rear driver's-seat of the vehicle, [n.13] and that no one occupied the front passenger's seat at the time of Carlson's stabbing. Other evidence demonstrated that Brooks was the individual seated in the back seat of Carlson's vehicle. Importantly, Davis was in a leg cast at the time of the murder. That fact renders it highly unlikely that Davis would have been able to sit in the back seat of a car in a position that would have left him able to muster the leverage utilized to mount this attack from behind. Moreover, a shoe print was found on Carlson's shoulder. A forensic expert opined that the print was consistent with the killer extricating himself from the vehicle by climbing over the victim's body, which was found in the front seat, or opening the driver's-side front door and kicking Carlson over. Either feat would have been almost impossible for a man in a leg cast. Moreover, Davis sat in the front passenger seat during the prior failed murder attempts as established by the trooper who stopped Carlson for speeding and testified to seeing a baby in the back seat and a black man in the right front seat.

[N.13] This evidence included nondescript contact blood stains found on the exterior of the vehicle on the driver's-

side front and rear doors; contact blood stains on the interior rear driver's-side door that were consistent with someone with blood on their hands attempting to exit the vehicle; contact stains on the driver's headrest consistent with placement of a bloody hand; and medium-velocity blood spatter and arterial spurting on the front passenger's door panel. Based on this evidence, the crime scene analyst concluded that Carlson was behind the steering wheel when the attack began, that the attack continued as she moved to the front passenger's side of the vehicle, and that her attacker was seated in the driver's-side back seat. Another forensic expert concurred with this conclusion.

Brooks II, 918 So. 2d at 186-87, 194-97 (quoting Brooks I, 787 So. 2d at 768-69) (some footnotes omitted).

As a basis for imposing sentences of death for the murders of Carlson and Stuart, the trial court found that four statutory aggravating circumstances had been proven beyond a reasonable doubt for each murder: (1) Brooks was previously convicted of another capital felony (the contemporaneous murder of the other victim); (2) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); (3) the murder was committed for pecuniary gain; and (4) the murder occurred while the defendant was engaged in the commission of aggravated child abuse. Id. at 187.[1]

_____

1. The trial court refused to consider as an aggravating factor that Stuart was less than twelve years of age, because it concluded that "consideration of that factor would constitute improper doubling with the aggravating factor of murder in

The trial court additionally found as an aggravating factor that Carlson's murder was especially heinous, atrocious, or cruel (HAC). Id.

Although Brooks waived his right to present mitigating evidence, counsel described for the trial court the mitigating evidence they would have presented. Id. Based on this information, the trial court found the following statutory mitigating circumstances: (1) Brooks lacked a significant criminal history (little weight); and (2) Brooks was twenty-three years old at the time of the murders (little weight). Id. at 187 n.2. The trial court additionally found the following nonstatutory mitigating circumstances: (1) Brooks' codefendant, Walker Davis, Jr., was sentenced to life imprisonment (little weight); (2) Brooks has strong family ties and participated in community affairs (very little weight); (3) Brooks is his family's only living son (some weight); (4) Brooks' military service (little weight); (5) Brooks demonstrated good character and an ability to establish loving relationships (little weight); (6) Brooks is the father of a six-year-old child (some weight); (7) Brooks exhibited good courtroom behavior and demeanor (some weight); (8) Brooks regularly attended church and had Christian training (little weight); (9) Brooks' employment history (little weight); (10) the sufficiency of life in prison without the possibility of parole as punishment (little weight); and (11) the sufficiency of life

---

the course of a felony predicated on aggravated child abuse." Brooks II, 918 So. 2d at 187 n.1.

in prison without parole to protect society (some weight).  Id.

On direct appeal, Brooks presented fourteen claims.  Id. at 187-211. Specifically, Brooks contended that the trial court erred when it: (1) admitted a life insurance policy; (2) permitted testimony regarding child support records; (3) admitted notes seized from Davis' leg cast; (4) permitted the State to impeach Melissa Thomas regarding whether, on the night of the murders, Brooks changed clothes in her apartment; (5) permitted Mark Gilliam to testify regarding Brooks' desire to shoot the police officer who approached Gilliam's vehicle during the first failed attempt to murder the victims; (6) denied several objections to comments made by the prosecutor during closing statements; (7) refused to instruct the jury on section 90.803(18)(e), Florida Statutes (1996);[2] (8) denied Brooks' motion for mistrial; (9) denied Brooks' motion to change venue; (10) found that Brooks committed the murder during the course of an act of aggravated child abuse and relied upon this fact to justify the imposition of the death sentence; (11) found the pecuniary gain and CCP aggravating circumstances applied to the murder of

---

2.  Section 90.803(18)(e), Florida Statutes (1996), provides that an admission is a statement that is offered against a party and is: "[a] statement by a person who was a coconspirator of the party during the course, and in furtherance, of the conspiracy.  Upon request of counsel, the court shall instruct the jury that the conspiracy itself and each member's participation in it must be established by independent evidence, either before the introduction of any evidence or before evidence is admitted under this paragraph."

Stuart; (12) found that the sentences of death were proportionate; (13) refused to require the jury to return a special verdict that specified which aggravating circumstances were found and the accompanying vote; and (14) assigned the jury's recommendation great weight. Id. at 187-211.

This Court determined that five errors of law occurred during the course of Brooks' retrial, including: (1) the erroneous admission of testimony concerning the child support records; (2) the erroneous admission of the notes recovered from Davis's leg cast; (3) the improper impeachment of Thomas; (4) the trial court's failure to read the jury instruction for section 90.803(18)(e) as requested by defense counsel; and (5) the erroneous reliance by the trial court on the aggravating factor that the murders were committed during the course of an act of aggravated child abuse. Id. at 202.[3] However, we concluded that there was no reasonable

---

3. Brooks contended on appeal that the trial court erred by finding that he committed the murders during the course of a felony (aggravated child abuse), and then applying the aggravating circumstance based on the aggravated child abuse. Brooks II, 918 So. 2d at 197. Specifically, he alleged that "because the single act of stabbing [the child] formed the basis of both the aggravated child abuse aggravating factor under section 921.141(5)(d) of the Florida Statutes and the first-degree felony murder charge, the court should have found that the aggravated child abuse allegation 'merged' with the more serious homicide charge." Id.

A majority of the Court agreed with this argument, concluding that the aggravated child abuse based on a single stab wound would merge with the homicide, but found this error to be harmless. Id. at 198-99, 217 (Lewis, J., concurring in part, dissenting in part). However, in 2012, this Court receded from Brooks to the "extent it holds that felony murder cannot be predicated upon a single act of aggravated child abuse," and held that "the merger doctrine does not preclude a felony-murder conviction predicated upon a single act of aggravated

probability that any of these errors, either individually or cumulatively, contributed to Brooks' convictions, and affirmed Brooks' convictions and sentences. Id. at 197, 199-202, 211. The United States Supreme Court denied certiorari review on May 22, 2006. Brooks v. Florida, 547 U.S. 1151 (2006).

## Postconviction Proceedings

On May 18, 2007, Brooks filed an initial seven-claim motion to vacate judgment of convictions and sentences. Brooks later amended his motion to add two additional claims. The claims presented were: (1) counsel performed ineffectively when they failed to present and/or the State failed to disclose, critical exculpatory evidence during the guilt phase; (2) counsel performed ineffectively when they failed to present available evidence to the jury, despite promising to do so during opening statements; (3) counsel performed ineffectively when they failed to investigate and present available mitigation; (4) counsel performed ineffectively when they failed to provide Brooks with adequate mental health assistance during trial; (5) Florida's rules prohibiting postconviction counsel from interviewing jurors unconstitutionally inhibit Brooks from determining if constitutional errors occurred; (6) the lethal injection procedures violate the Eighth Amendment; (7) Brooks' convictions and sentences of death constitute cruel and unusual

---

child abuse that caused the child's death since aggravated child abuse is an enumerated underlying offense in the felony-murder statute." State v. Sturdivant, 94 So. 3d 434, 441-42 (Fla. 2012).

- 11 -

punishment; (8) the State would violate the Eighth Amendment ban against cruel and unusual punishment by executing Brooks, a brain-damaged, mentally impaired individual; and (9) Brooks is exempt from execution under the Eighth Amendment because he suffers from severe brain damage and other mental limitations.

The postconviction court granted an evidentiary hearing on claims 1, 2, 3, 4, and 9, and summarily denied claims 5, 6, 7, and 8. The evidentiary hearing was held over the course of four days between January and May 2008. However, in January 2009, the postconviction court judge died unexpectedly before a final order on Brooks' postconviction claims was issued. The case was reassigned to a successor judge, and a new evidentiary hearing was held on the same claims.

During the second evidentiary hearing, Brooks presented five witnesses. Two of the witnesses, Wilden Davis, Brooks' cousin, and Joanne Washington, Brooks' childhood friend, testified that Brooks was an intelligent, witty, and happy child. However, both Davis and Washington testified that after Brooks joined the military and returned from overseas, he became reclusive, withdrawn, irritable, and occasionally verbally and physically aggressive. Brooks started drinking heavily and occasionally smoked marijuana.

Dr. Hyman Eisenstein, a clinical psychologist with a specialty in neuropsychology, testified that Brooks exhibited brain dysregulation, and diagnosed Brooks with chronic post-traumatic stress disorder (PTSD) and alcohol

abuse.  Dr. Eisenstein testified that at the time of the murders, Brooks was additionally suffering from an extreme mental or emotional disturbance, was abusing alcohol, and could not conform his conduct to the requirements of law. However, Dr. Eisenstein's testimony was significantly impeached during cross-examination.  Dr. Eisenstein admitted that Brooks was generally uncooperative, did not give his best effort during the initial evaluation, and refused to see him for a second evaluation.  Thus, Dr. Eisenstein admitted that his diagnosis of PTSD and his conclusion that Brooks was suffering from an extreme emotional disturbance were only "tentative" because Brooks was uncooperative during the evaluation process.  Dr. Eisenstein additionally admitted that his belief that Brooks was drinking on the night of the murders was merely an assumption based on prior conduct.

Finally, Brooks presented Kepler Funk and Keith Szachacz, the attorneys who represented Brooks during his initial direct appeal and, after his convictions were reversed, during the retrial.  Both Funk and Szachacz testified in detail regarding their relationship with Brooks, their approach to Brooks' retrial, and the strategic decisions they made both before and during Brooks' retrial.

The State presented three witnesses.  Barry Beroset, Brooks' counsel during the first trial, testified regarding his trial strategy, the extent of his mitigation investigation, and whether he pursued mental health mitigation.  Debbie

Carter, a legal assistant with the State Attorney's Office, and Robert Elmore, the Assistant State Attorney who prosecuted Brooks and his codefendant, testified regarding the State's discovery procedures and whether certain documents were disclosed to the defense during pretrial discovery.

On March 9, 2011, after the evidentiary hearing was completed, but before a final order was issued, Brooks filed a successive postconviction motion in which he alleged that newly discovered evidence established he did not murder Carlson or Stuart. A third evidentiary hearing was held on this claim, during which Brooks presented four witnesses.[4]

During the evidentiary hearing, Ira Ferguson, who was incarcerated and serving sentences for convictions of second-degree murder, grand theft auto, and robbery with a deadly weapon, testified that he met Walker Davis in prison. Ferguson informed Davis that he had visited in Crestview and knew several people who lived there. Ferguson later testified that he knew Gerrold Gundy, and that Carlson was Gundy's girlfriend. Ferguson testified that on the night of the murders, he arrived at a club between 10:30 and 11 p.m. Outside the club in the parking lot, Ferguson saw Gundy, Carlson, and a baby inside Carlson's vehicle.

---

4. The same newly discovered evidence claim was also presented by Brooks' codefendant. Brooks and Davis agreed to a joint evidentiary hearing before the successor judge.

Ferguson testified that he approached them, asked for a cigarette, and departed from the area. When he returned, Ferguson noticed that the vehicle had been moved onto a side street. Shortly thereafter, Ferguson heard a door slam and saw Gundy and Carlson arguing. Ferguson left the scene and drove to a friend's house. The next day, Ferguson learned of Carlson's and Stuart's deaths, but he did not contact the authorities.

Funk testified that he never encountered Ferguson during the course of his investigation of the murders. He further testified that he investigated Gundy as a possible suspect, but ultimately decided, with Brooks' consent, that the best course of action was to not attempt to connect Gundy to the murders. In addition, he testified that he and Szachacz conducted an extensive investigation and concluded that there was no "indication in any way, shape[,] or form . . . that Ms. Carlson was alive at 10:45. I think that it was contradicted by the evidence, frankly."

Daniel Ashton, a private investigator, testified that he became involved with Brooks' case in 2006. The first time he learned of Ferguson was in July 2010, when he received a phone call from Davis' mother. He testified that while he was investigating the murders, he never encountered any evidence that: (1) placed Ferguson in Crestview at the time of the murders; or (2) corroborated Ferguson's testimony that he saw Gundy with Carlson at a nearby club at 10:45 p.m. on the night of the murders. Ashton additionally testified during cross-examination that

- 15 -

no evidence found during the investigation supported Ferguson's testimony that Gundy fought with someone outside of the club on the night of the murders or that Gundy knew Carlson. Ashton was also unable to locate Michelle Roberts, the friend whose house Ferguson allegedly went to on the night of the murders.

Elizabeth Hutchinson testified that she met Ferguson through mutual friends who travelled from Miami to visit her in Crestview in 1996. Hutchinson testified that she also knew Gundy and she had never seen Ferguson and Gundy together.

The State presented several witnesses in rebuttal. Glenn Swiatek, who briefly represented Walker Davis on appeal, testified that he introduced himself to Ferguson shortly before Ferguson was deposed. During that conversation, Ferguson asked Swiatek to provide him information as to the date on which the murders occurred. Immediately after Swiatek provided the information, he observed Ferguson write the date at the top of an affidavit. Swiatek testified that Ferguson told him that he asked Swiatek for this date information only to determine whether Swiatek was an undercover agent.

Gerrold Gundy testified that he had never met Carlson, but that around the time of the murders he had a girlfriend named Shawna Tatum, who, like Carlson, was a white female with blonde hair. Also like Carlson, Tatum had a young child and drove a small red vehicle. Gundy recalled an incident in 1999 in Crestview where he and three men who were related to Ferguson were arrested on drug

charges. Gundy testified that he did not know these men and was later released when the police determined that he had no connection to the crime. When Gundy was shown two pictures of Ferguson, he stated it was possible that he had seen Ferguson before, but that he and Ferguson were not friends and he did not interact with Ferguson on the night of the murders.

Margaret Summers, a sergeant with the Florida Department of Corrections (DOC) who worked at the Wakulla Corrections Institution Annex from October 2008 to June 2011, testified that she studied the internal movement records of Davis and Ferguson while they were incarcerated in that facility. She testified that she never saw Ferguson and Davis together, nor did she locate a time when they were housed in the same dormitory. Although there was a two-month period when Davis and Ferguson could have interacted during recreational hours, she could recall only one occasion when Ferguson and Davis were in the same location at the same time. Sylvia Williams, a records custodian for the Florida Department of Law Enforcement (FDLE), testified that from April 2010 to November 2010 and from April 2003 to July 2003, Davis and Ferguson were housed in the same facility.

On March 12, 2012, the postconviction court issued an order denying all of Brooks' claims, including the newly discovered evidence claim presented in the successive motion. This appeal follows.

## ANALYSIS

## Strickland **Standard of Review**

Brooks' first two claims on appeal challenge the postconviction court's determination that counsel did not perform ineffectively during the guilt phase of his retrial. This Court recently described what a defendant must establish to succeed on a claim of ineffective assistance of trial counsel:

> [T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. See Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel's performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel's performance, an objective standard of reasonableness applies, id. at 688, and great deference is given to counsel's performance. Id. at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 669.
>
> Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [Id. at] 689. A defendant must do more than speculate that an error affected the outcome. Id. at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Both deficient performance and prejudice must be shown. Id.

Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010).

Ineffective assistance claims are reviewed under a mixed standard of review because the performance and prejudice prongs of Strickland present mixed questions of law and fact. Id. at 672. Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses. See Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007). As a result, this Court defers to the postconviction court's factual findings so long as those findings are supported by competent, substantial evidence. See Bradley, 33 So. 3d at 672. However, this Court reviews the postconviction court's legal conclusions de novo. Id. Finally, because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied. See Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006).

**Failure to Present "Critical, Exculpatory" Evidence**

In his first claim, Brooks contends that his trial attorneys performed ineffectively when they failed to present several pieces of "critical, exculpatory evidence" during the guilt phase of his retrial. The postconviction court denied this claim, concluding that Brooks had failed to establish either deficiency or prejudice. Before addressing these claims individually, we note that there is an

abundance of evidence which demonstrates that Brooks clearly and unequivocally waived his right to present a defense case-in-chief during his retrial. For example, the court conducted the following colloquy with Brooks to address whether he agreed with the decision not to present a defense:

> COURT: Let me ask at this time. You've already stated on the record that it's the position of the defendant that he's not going to put on any witnesses at this time.
>
> COUNSEL: That's correct.
>
> COURT: And, Mr. Brooks, you realize you have a constitutional right to testify on your behalf, and as I understand it, you're waiving that opportunity at this point, is that correct?
>
> BROOKS: Yes.
>
> COURT: And you're also waiving the constitutional right that you'd have to present witnesses on your behalf, is that correct?
>
> BROOKS: Yes.
>
> COURT: So [counsel's] assertion that you're going to rest . . . that's what you want to do, is that correct?
>
> BROOKS: Yes.

Further, Brooks' attorneys, Funk and Szachacz, testified extensively during the evidentiary hearing regarding their trial strategy and their relationship with Brooks. Funk testified that during the retrial he and Szachacz met with Brooks daily to discuss the case. They asked for Brooks' input and involved him in every decision. After the State rested, Funk and Szachacz reviewed the record, examined the evidentiary value of presenting witness testimony, and considered the strategy

of prior counsel, who had unsuccessfully presented a defense during the first trial. They then discussed the case with Brooks, and with his input, determined that the best course of action was to not present a defense. Counsel testified that while they would have liked to present the evidence discussed below, none of that evidence, independently or collectively, was strategically important enough to outweigh the benefits of retaining first and last closing statements, especially considering that Brooks had been charged with the emotionally charged crime of brutally murdering a three-month-old baby and her mother.[5]

_____

5. At the time of Brooks' retrial, Florida Rule of Criminal Procedure 3.250 provided that "a defendant offering no testimony in his or her own behalf, except the defendant's own, shall be entitled to the concluding argument before the jury." However, in 2006, the Legislature created a new statutory provision, section 918.19, Florida Statutes, to govern closing statements in criminal trials. In re Amend. to the Fla. Rules of Crim. Pro.—Final Arguments, 957 So. 2d 1164, 1165 (Fla. 2007). The statute provides that the prosecution shall present the first closing statement, the defendant may respond, and the prosecution may then reply in rebuttal. Id. at 1166. In response to the change in the law, we amended rule 3.250 to eliminate the portion of the rule providing that the defense has the right to the final closing statement where the defendant offered no evidence during trial other than his or her own testimony. Id. We also adopted Florida Rule of Criminal Procedure 3.381, which states that in all criminal prosecutions, "the prosecuting attorney shall be entitled to an initial closing argument and a rebuttal closing argument before the jury or the court sitting without a jury." See Fla. R. Crim. P. 3.381; see also Final Arguments, 957 So. 2d at 1166-67. Thus, although it is not currently the law, at the time of Brooks' trial, the rules of criminal procedure provided a strategic advantage to defense counsel for not presenting witness testimony.

Additionally, Brooks contends that prejudice has been established because during trial, his attorneys proffered much of the evidence discussed below. Brooks asserts the proffers demonstrate that his attorneys wanted to present the proffered evidence and felt the information was critical to the defense. However, prejudice is not established based solely on the subjective assessments of a party or his or her counsel regarding the importance of evidence. Rather, prejudice is established only when the defendant can establish a reasonable probability, which is a probability sufficient to undermine confidence in the outcome of that proceeding, that but for counsel's unprofessional errors, the result of the proceeding would have been different. See Bradley, 33 So. 3d at 671-72. Thus, simply because trial counsel wished to present certain evidence, does not establish that Brooks was prejudiced by counsel's failure to do so. Although the facts indicate that trial counsel made a reasonable, strategic decision not to present a defense case-in-chief, we address each of the individual pieces of evidence Brooks claims counsel failed to present.

**Lack of Forensic Evidence Linking Brooks to the Murders**

Brooks contends that trial counsel performed deficiently when they failed to present witnesses to emphasize that no forensic evidence discovered either at the crime scene or found on Brooks' person linked him to the murders. Although Brooks does not dispute that counsel attempted to establish reasonable doubt, he

- 22 -

contends that they performed deficiently when they neglected to utilize the lack of forensic evidence to further establish a reasonable doubt in the minds of the jury.

During the evidentiary hearing, Funk testified he and Szachacz believed the lack of forensic evidence that connected Brooks to the crime was a critical fact that significantly favored the defense. To maximize the value of this fact, Funk and Szachacz testified that their trial strategy was to bolster the credibility of the State forensic experts by portraying them as experts in their field. According to Funk, if the jury believed that the forensic experts were "the greatest thing since sliced bread [who] could find a needle in any haystack," he and Szachacz could establish reasonable doubt during closing statements by emphasizing that even the best forensic experts failed to uncover <u>any</u> evidence that linked Brooks to the crimes. Both Funk and Szachacz were aware that several pieces of evidence—including the hair discovered in the victim's hand,[6] vacuum sweepings taken from the victim's car, and Brooks' backpack—had been forensically analyzed and revealed no scientific connection between Brooks and the murders. However, Brooks'

---

6. Brooks places particular emphasis on counsel's failure to present evidence that a Caucasian hair found in the victim's hand did not belong to him. However, during the evidentiary hearing, Szachacz testified he could not recall if DNA testing had been conducted on the hair sample, but recalled that during Brooks' first trial, a forensic hair expert testified that the hair was similar in color and appearance to that of Carlson herself. Further, Brooks presented no evidence during these proceedings that demonstrates the hair had any relevance to this case.

counsel testified that they ultimately made the strategic decision not to present

forensic experts so that they could assert during the final closing statement:

> We've got the experts that can gather evidence. Why do you think
> they do it, for fun? It's for this purpose. This is what their job is, to
> gather evidence. Some examples of those in cases are DNA, DNA.
> Do you have it this case? None. Okay? That FDLE's got serologists,
> DNA folks, microanalysis, handwriting experts, voice stress experts,
> document examiners, pen pressure testing, paper testing, ink, fibers,
> ropes, shoeprints. They have people there, scientists, that test this
> stuff[,] . . . like Jan Johnson who are solely trained . . . to make sure I
> preserve [evidence] so it doesn't get contaminated, and properly
> collect it, package it, to get it to those people. Hair fibers. What do
> we have in this case? None. Saliva, none. Skin cells, none.
> Shoeprints, none. I'm talking about evidence in criminal trials where
> the Government is able to meet their burden. Confessions happen in
> criminal cases. In this case, none. Handwriting analysis? This case,
> none, none. Blood on people? This case, [Brooks], none.

This Court has, on several occasions under similar circumstances, concluded

that the decision to preserve the first and last closing statements constitutes a sound

trial strategy. See Van Poyck v. State, 694 So. 2d 686, 697 (Fla. 1997) (concluding

that counsel made a tactical decision to refrain from presenting a defense case-in-

chief to preserve the first and last closing statements); see also Evans v. State, 995

So. 2d 933, 945 n.16 (Fla. 2008). Thus, both the record and our prior precedent

demonstrate that trial counsel made a reasonable, strategic decision to retain the

tactical advantage of presenting the final closing statement and to pursue the theory

of reasonable doubt by arguing, through inference rather than witness testimony,

that no forensic evidence linked Brooks to the murders. See Johnston v. State, 63

So. 3d 730, 737 (Fla. 2011) (holding that strategic decisions do not constitute ineffective assistance if counsel considers and rejects alternative courses when the final strategy was reasonable under the norms of professional conduct). Therefore, because it is evident that Brooks has failed to establish deficiency, we need not address the prejudice prong of <u>Strickland</u> and conclude that counsel did not perform ineffectively. We affirm the postconviction court's denial of this subclaim. <u>See</u> <u>Mungin</u>, 932 So. 2d at 996.

Gerrold Gundy

Brooks next contends that trial counsel performed deficiently when they failed to present several pieces of evidence that purportedly connected Gundy to the murders. Specifically, Brooks contends that: (1) Gundy was allegedly seen riding with a white female driver in a car similar to the one driven by the victim; (2) a crime scene dog tracked footsteps from the scene of the crimes to the doorstep of Gundy's house; (3) a partially smoked Marlboro cigarette was found on the street near Gundy's home, and an open pack of the same brand of cigarettes was found inside the victim's car; and (4) a confidential informant told law enforcement that Gundy was Carlson's friend or boyfriend.

However, for each piece of evidence, Funk or Szachacz logically explained why the defense strategically decided not to present it during the retrial. For example, Funk noted that the crime scene dog that tracked footsteps to Gundy's

- 25 -

doorstep <u>did not begin the search from the crime scene</u>, but rather began tracking from a dirt road about thirty yards away from the scene. Additionally, Brooks' counsel was aware that Gundy had a Caucasian girlfriend who, like Carlson, had an infant child and drove a small red vehicle. This fact explains why the witnesses could have mistakenly thought that Gundy's girlfriend was Carlson, and further supports the decision not to present this evidence during trial.

Based on this evidence, and other evidence that rebuts any potential connection between Gundy and the murders, Funk testified, "Did we think that [the State] had the ability to rebut any claim that Gundy was the one who committed these homicides? Yeah, we knew that. We knew we [were not] going to be able to prosecute Gerrold Gundy." Funk added that to attack the credibility of the forensic experts, including the crime scene dog, would have undermined the defense strategy to bolster the credibility of the State forensic experts and then rely on their credibility to stress the lack of forensic evidence connecting Brooks to the crime. Thus, after he and Szachacz discussed the issue thoroughly with Brooks, they "made the decision that it wasn't worth pursuing. The downside outweighed any potential upside."

Accordingly, we conclude that Brooks' trial counsel made a reasonable, strategic decision to not lose credibility with the jury and forego the ability to present the last closing statement to present evidence that initially appeared to

connect Gundy to the murders, but ultimately would have been substantially impeached by the State. Counsel did not perform deficiently with respect to this claim, and we hold that the postconviction court properly rejected this challenge of ineffectiveness. See McCoy v. State, 113 So. 3d 701, 716 (Fla. 2013).

### Green Nissan

Before trial, a confidential informant reported that a stolen green Nissan was recovered that matched the description of a vehicle suspected to be associated with the murders. The vehicle purportedly had blood spatter inside the cabin and on the hood. Although Brooks contends that counsel performed deficiently when they failed to present this evidence, he presented no evidence during the postconviction proceedings to demonstrate that this Nissan had any connection to the murders. Brooks has also failed to demonstrate that any further investigation of the Nissan would have rendered this evidence probative or admissible.

During the evidentiary hearing, Funk testified that nothing connected the stolen Nissan to any aspect of Brooks' case. Szachacz similarly testified that the information regarding the Nissan was "worthless" and could not have been used to support Brooks' defense. Funk explained that they discussed this issue with Brooks and agreed not to present evidence of the Nissan to the jury. We conclude that counsel made a reasonable assessment of the evidentiary value of the Nissan and tactically decided not to present it. Therefore, because Brooks has failed to

establish either that his counsel performed deficiently by failing to present this evidence or that this failure undermined confidence in the outcome of his trial, we conclude that the postconviction court did not err when it denied this subclaim.

Timeline

Brooks contends that trial counsel performed deficiently when they failed to present evidence from two witnesses, LaConya Orr and Tim Clark. According to Brooks, these witnesses would have presented evidence that would have contradicted the State's timeline. Specifically, Brooks contends Orr told police that between 8:45 and 9 p.m. on the night of the murders, Davis and a "skinny, shorter black male" came to her house looking for her husband. The men left on foot when Orr told them that her husband was not home. Similarly, Brooks contends Clark would have testified that, between 9 and 10 p.m. on the same night, Clark saw Carlson in her vehicle conversing with a black male. Clark was shown pictures of Davis and Brooks, but he could not identify either of the men as the individual he saw with Carlson.[7]

---

7. Brooks additionally claims that two other witnesses were prepared to testify regarding what they saw near the scene of the murders. However, Funk testified that those witnesses "had some significant impairment of their ability to recall and have recollection with accuracy," and noted that they had been presented during Davis' trial, where their testimony was significantly impeached. Thus, Brooks' trial counsel did not perform deficiently when they strategically decided not to present these witnesses. Bolin v. State, 41 So. 3d 151, 159 (Fla. 2010)

During the evidentiary hearing, Funk testified that he and Szachacz thoroughly researched whether testimony could be presented to rebut the State's timeline. They reenacted what Clark told police to determine whether it was possible to identify Carlson from the location where Clark had allegedly seen Carlson sitting in her vehicle. Further, Funk and Szachacz discovered that although Clark had initially stated that he could not identify the person with Carlson on the night of the murders, he later changed his position and stated "with certainty" that Brooks was the black male with Carlson. In light of Clark's statement, Szachacz testified that there was "no way we [could] call [Clark] because he was going to hurt [] Brooks." Funk shared the same sentiments, stating that they did not present Clark because he could not imagine anything connecting Brooks with Carlson "ever helping because [] Davis was the one that had the link to [] Carlson."

Similarly, Szachacz testified that Orr's husband had given a statement to law enforcement that placed Davis and Brooks at Orr's house slightly after 8 p.m. Szachacz and Funk knew that timeframe left more than enough time for Brooks and Davis to drive from Eglin Air Force Base to Crestview and commit the murders because they had driven the route themselves in preparation for trial.

(noting that "counsel is not ineffective where counsel decides not to present a witness with questionable credibility").

- 29 -

Further, Orr could not positively identify Brooks as the individual who approached her house with Davis. Based on the limitations of Orr's potential testimony, Funk testified, "I know we talked about [presenting Orr as a witness] extensively. . . . And the bottom line analysis was, from a strategic standpoint, it was best not to go there. I think the jury would see through that."

Based on these facts, we hold that the postconviction court did not err when it concluded that trial counsel did not perform deficiently by failing to present Orr and Clark as witnesses. Both attorneys thoroughly researched whether they could challenge the State's timeline and ultimately concluded that: (1) Clark's testimony would have placed Brooks with Carlson near the time of the murders; and (2) Orr's testimony would likely have been substantially impeached by the prosecution. Thus, because neither witness's testimony would have substantially aided the defense, we conclude that trial counsel made a reasonable, strategic decision not to present the witnesses. See Reynolds v. State, 99 So. 3d 459, 498-99 (Fla. 2012) (holding that counsel was not ineffective for failing to present unfavorable testimony). Therefore, because it is evident that Brooks has failed to establish deficiency, counsel cannot be deemed ineffective, and we affirm the denial of this subclaim. See Mungin, 932 So. 2d at 996.

Polygraph Examination of Melissa Thomas

During trial, Melissa Thomas testified that on the night of the murders, Davis and Brooks came to her Crestview apartment at approximately 9 p.m. wearing black nylon pants. Brooks II, 918 So. 2d at 200. She testified that while inside her home, Brooks excused himself to use the bathroom. Id. Thomas then testified that she recalled being interviewed by police shortly after the murders. Id. When the prosecutor asked Thomas whether she recalled telling Agent Haley during the interview that Brooks exited the bathroom wearing shorts, Thomas answered, "No, I don't remember." Id.

The State subsequently presented Agent Haley, who testified that Thomas had previously told him Brooks changed into shorts while in the bathroom. Id. Counsel objected, asserting that the question constituted improper impeachment because Thomas' trial testimony did not materially differ from her statement to Haley. Id. The trial judge allowed the impeachment on the basis that her trial testimony and her previous statement to Agent Haley were "contradictory to a degree." Id.

On direct appeal, Brooks contended the trial court erred when it permitted the prosecutor to impeach Thomas with the statement she had provided to Agent Haley. Id. This Court agreed, and held that:

> the trial judge in the instant case allowed the impeachment of
> Thomas's testimony because he found her testimony inconsistent to a
> degree with her prior statement, not because he determined that she
> was fabricating her inability to recall the content of her police

statement. Given the other detailed evidence provided by Haley and the fact that Brooks' retrial occurred six years after the murders were committed, there is no basis on which to conclude that Thomas fabricated her lack of recollection. For that reason, the trial court erred in permitting the impeachment of Thomas's trial testimony with her previous statement.

Id. However, we determined that the error was harmless:

> Permitting Agent Haley to testify to the prior statement of Thomas, in which she indicated that Brooks had changed into shorts in her bathroom, did not contribute to his conviction. Neither Thomas nor any of the witnesses who placed Brooks in Crestview on the night of the murders indicated that he or his clothes were covered in blood. The State did not recover or seek to introduce any blood-stained clothing. In the absence of any such evidence, testimony that Brooks changed clothes in Thomas's bathroom is of no consequence.

Id. (emphasis supplied).

During the postconviction proceedings, Brooks has alleged both Strickland and Giglio v. United States, 405 U.S. 150 (1972), violations relating to Thomas' and Haley's testimony. He contends his trial counsel performed deficiently when they failed to present the results of Thomas' polygraph examination. During the examination, Thomas responded in the negative when asked whether she noticed if Brooks changed clothes in her apartment. This answer was deemed truthful by the polygraph administrator. Brooks alleges that counsel performed deficiently when they failed to present these results to rehabilitate Thomas' trial testimony.

We conclude that this claim of ineffectiveness fails both prongs of Strickland. As the postconviction court noted, polygraph evidence is generally

- 32 -

inadmissible, and trial counsel cannot be deemed deficient for failing to present inadmissible evidence. See Gosciminski v. State, 132 So. 3d 678, 702 (Fla. 2013) (noting that "[p]olygraph evidence has, as a matter of law, long been inadmissible as evidence in Florida"), cert. denied, 135 S. Ct. 57 (2014); Owen v. State, 986 So. 2d 534, 546 (Fla. 2008). Further, even if we were to conclude that counsel performed deficiently when they failed to rehabilitate Thomas with the results of her polygraph examination, Brooks has failed to demonstrate prejudice because we specifically held on direct appeal that any testimony relating to whether Brooks changed clothes in Thomas' bathroom was "of no consequence" and "did not contribute to his conviction." Brooks II, 918 So. 2d at 201. These conclusions demonstrate that counsel's failure to present this evidence does not undermine confidence in the outcome of Brooks' trial. Therefore, Brooks' claim of ineffectiveness was properly denied by the postconviction court.

Brooks next contends that the prosecutor committed a Giglio violation by presenting Agent Haley's allegedly misleading testimony during trial. Brooks claims that "despite knowing that Thomas was truthful in her response on the polygraph that Mr. Brooks did not change clothes, the prosecutor wanted the jury to believe otherwise." A Giglio violation is demonstrated when: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Davis v. State, 26 So.

- 33 -

3d 519, 532 (Fla. 2009). We conclude that Brooks has failed to establish any of the three Giglio prongs.

First, Brooks' claim that Thomas definitively stated during the polygraph that Brooks did not change clothes is false. Instead, during the polygraph examination, Thomas was asked if she noticed "if [Brooks] changed clothes," to which she responded "no." Thomas testified during trial that she did not remember telling Agent Haley that Brooks changed clothes. Thus, Thomas never definitively stated that Brooks did not change his clothes in her apartment. Accordingly, the State did not knowingly present false testimony when it elicited from Agent Haley that Thomas told him during an interview that Brooks changed into shorts in the bathroom of her apartment. Therefore, the first and second prongs of Giglio have not been met. Second, even if we were to conclude that the prosecutor knowingly presented false testimony, which we do not, Brooks has failed to demonstrate that any evidence concerning whether Brooks changed clothes in Thomas' apartment was material. In fact, we have previously determined that this evidence was "of no consequence" and not material. Brooks II, 918 So. 2d at 201. Therefore, the third prong of the Giglio test has not been met, and we deny relief on this claim.

## Conclusion

In sum, we conclude that trial counsel did not perform ineffectively when they did not present the foregoing evidence during trial. We also conclude that

- 34 -

Brooks has failed to establish a <u>Giglio</u> violation. Thus, the postconviction court did not err in denying this claim.

**Failure to Present Evidence Discussed During Opening Statements**

In this claim, Brooks again contends that trial counsel performed ineffectively when they failed to present the "critical, exculpatory" evidence discussed above. However, here he claims that counsel performed ineffectively because they "promised" during opening statements to present this evidence, but then failed to present it during trial. The postconviction court denied this claim, concluding that Brooks failed to demonstrate either deficiency or prejudice.

In the prior claim, we concluded that trial counsel made reasonable, strategic decisions not to present several pieces of evidence, and at the time of trial Brooks also agreed not to present this evidence. Thus, whether trial counsel performed ineffectively concerning the <u>failure to present</u> this evidence was previously addressed and will not be discussed further. Rather, the only additional claim presented by this issue is whether trial counsel, by failing to present the evidence after they told the jury during opening statements that it would be presented, performed ineffectively.

Opening statements are not substantive evidence, but rather serve to outline what an attorney <u>expects</u> will be established by the evidence presented during trial. <u>Occhicone v. State</u>, 570 So. 2d 902, 904 (Fla. 1990). During the evidentiary

hearing, Funk testified that he and Szachacz spent hours planning, rehearsing, and modifying their opening statement to incorporate what they believed the evidence would show during the retrial. However, during trial, the prosecutor strategically limited the direct examination of specific witnesses to prevent the defense from cross-examining them on certain subjects. When Funk and Szachacz attempted to cross-examine the witnesses concerning the evidence previously discussed, the prosecutor successfully objected to that questioning as outside the scope of direct examination. As a result, certain evidence counsel had previously stated "the jury would hear" was, in fact, only heard by the trial judge during a proffer. Funk testified that, as the trial progressed, he and Szachacz considered whether the benefits of presenting witnesses outweighed the procedural benefits afforded at the time to defendants who did not present a case-in-chief. They discussed the issue thoroughly with Brooks, and ultimately concluded that none of the evidence discussed by counsel during opening statements outweighed the value of retaining the opportunity to present the first and last closing statements.

We have, under similar circumstances, held such conduct by defense counsel to be reasonable and strategic. See Beasley v. State, 18 So. 3d 473, 491-92 (Fla. 2009) (concluding that counsel's decision not to present a defense case-in-chief to preserve the benefits of giving both first and last closing argument was a "reasonable defense strategy based on the procedural rules in force at the time of

trial."). Based on the foregoing, we conclude that trial counsel did not perform deficiently when they failed to present the evidence previously discussed to support the assertions made during opening statements. Thus, the postconviction court did not err when it denied this claim.

**Failure to Investigate and Present Mitigation**

In his third claim, Brooks contends that his trial counsel failed to adequately investigate and present mitigating evidence. According to Brooks, had counsel conducted a proper investigation, they would have uncovered evidence that Brooks suffered from alcohol abuse and various mental deficiencies.

To demonstrate that counsel was ineffective for failure to investigate or present mitigating evidence, a defendant must establish that the deficient performance of counsel deprived the defendant of a reliable penalty phase proceeding. Hoskins v. State, 75 So. 3d 250, 254 (Fla. 2011). Furthermore,

> It is unquestioned that under the prevailing professional norms . . . counsel has an obligation to conduct a thorough investigation of the defendant's background. Moreover, counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. It is axiomatic that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.
> In the context of penalty phase errors of counsel, the prejudice prong of Strickland is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings.
> [A defendant] must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different

sentence. To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the evidentiary hearing—and reweigh it against the evidence in aggravation. However, the Supreme Court reiterated in Porter that "we do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' "

Simmons v. State, 105 So. 3d 475, 503 (Fla. 2012) (internal quotation marks and citations omitted).

We have further explained that a competent defendant may control decisions that pertain to his or her defense, including the presentation of mitigation evidence, and that counsel will not be rendered ineffective for following the wishes of a competent defendant. Dessaure v. State, 55 So. 3d 478, 484 (Fla. 2010). However, a defendant may waive the presentation of mitigation only when the waiver is made knowingly, voluntarily, and intelligently. State v. Larzelere, 979 So. 2d 195, 204 (Fla. 2008). The decision to waive mitigation must not be made blindly. Rather, counsel must first investigate all avenues of potential mitigation and advise the defendant so that he or she reasonably understands what is being waived and its ramifications, and is able to make an informed and intelligent decision. State v. Lewis, 838 So. 2d 1102, 1113 (Fla. 2002); see also Grim v. State, 971 So. 2d 85, 100 (Fla. 2007) ("We have recognized that a defendant's waiver of his right to present mitigation does not relieve trial counsel of the duty to investigate and ensure that the defendant's decision is fully informed.").

- 38 -

## Waiver and Investigation

During his first penalty phase trial, Brooks was not opposed to the presentation of mitigation. However, prior to the commencement of the second penalty phase on retrial, trial counsel Funk explained to the trial court that Brooks' decision with regard to the presentation of mitigation had changed:

> I can tell the Court that Mr. Brooks and Mr. Szachacz and myself have had long, long, long heart-to-heart discussions that include this topic about waiving mitigation, Judge. It's not something that's knee jerk as a result of a verdict that's not favorable to Mr. Brooks. He's maintained his innocence from day one and continues to. In terms of mental health mitigation, Mr. Brooks wouldn't allow us to pursue that route long before the guilty verdict, since we became involved in the case. Mr. Szachacz and I are well aware of the mitigators that are out there available and would have been recognized, and I feel confident that Mr. Brooks is making a knowing, intelligent waiver of his right to present, and I think it is a right to present mitigation no matter what I recommended. I'm not saying I recommended one way or the other, but I don't think it matters. I think what matters is that we've investigated and we're ready to put on the mitigation, Judge, and certainly we are, so I think the Court needs to go through that colloquy with Mr. Brooks.

Funk later told the trial court, "I don't intend on saying a word to this jury. That's what Mr. Brooks has instructed me to do, that I am not to stand up before this jury, No. 1, to present any mitigation and therefore to argue in favor of mitigation, well, of course, because we're not presenting any." Thereafter, the trial court inquired on three additional instances whether Brooks wished to present mitigation. However, on each occasion, Brooks reiterated he had not changed his mind and that he did not want to present mitigation.

During the evidentiary hearing, trial counsel testified that they actively investigated mitigation and discussed the possible presentation of mitigation with Brooks throughout trial. Szachacz testified that he and Funk interviewed Brooks' parents; reviewed his military, educational, and employment history; and reviewed the mitigation presented during the first penalty phase proceeding. Funk and Szachacz additionally considered presenting mental health mitigation, but decided against it because there was no evidence in Brooks' background or during the trial proceedings that indicated Brooks suffered from mental illness. Ultimately, Brooks directly instructed Funk and Szachacz not to present mitigation, contest aggravation, cross-examine penalty phase or <u>Spencer</u> hearing witnesses, file a sentencing memorandum, or in any way contest the imposition of the death penalty. In fact, during the evidentiary hearing, Brooks was asked by the postconviction court whether he wanted to present mental health mitigation during the postconviction proceedings. He responded:

> Your Honor, after the first trial—<u>I mean after the trial when I got the guilty verdict, understandably I was not in the mind set to deal with the sentencing phase so I didn't really want anything to do with it. I'm done with it.</u> And then when this appeal came around, my focus has always been on the guilt phase of it, not the sentencing phase. <u>So when [postconviction counsel] asked me about it at the time, I was still focused on the guilt and didn't want to have anything to do with it.</u> But now that it's an issue, I don't mind it being presented. I have no objection to it being presented, so I guess my answer in the short-term is yes, [postconviction counsel] can present it.

(Emphasis supplied.)

The foregoing facts reflect that after Brooks was initially convicted, he was amenable to the presentation of mitigation. When Brooks' convictions were reversed on appeal, Funk and Szachacz reviewed the mitigation in the record, communicated frequently with Brooks' parents regarding the presentation of mitigation evidence during the second penalty phase, and spent countless hours discussing the case with Brooks. After Brooks was convicted a second time, he made the conscious decision not to present mitigation and directly instructed Funk and Szachacz not to contest the imposition of the death penalty. Trial counsel obeyed his wishes, and Brooks was sentenced to death for both murders. A decade later, Brooks admitted during the evidentiary hearing that after being convicted a second time he was "not in the mind set to deal with the sentencing phase so I didn't really want anything to do with it." We conclude that trial counsel did not perform deficiently when they failed to present mitigation evidence during the penalty phase or to contest the imposition of the death penalty. Trial counsel conducted a reasonable investigation into potential mitigation and explained the benefits of presenting mitigation to Brooks. With that information, Brooks exercised his right to make a knowing, voluntary, and intelligent waiver of the presentation of mitigation, and counsel cannot be deemed deficient for honoring Brooks' decision not to contest the death penalty. See Dessaure, 55 So. 3d at 484.

Evidence Not Presented

Furthermore, even if we were to conclude that counsel performed deficiently, Brooks has failed to present mitigation evidence during the evidentiary hearing that undermines confidence in his sentences.  Brooks contends that had trial counsel conducted a reasonable investigation, they would have discovered that he: (1) drank alcohol daily and struggled with alcohol abuse; (2) suffered from PTSD; and (3) suffered from an extreme emotional or mental disturbance, and his ability to conform his conduct to the requirements of law was substantially impaired at the time of the murders.

Funk testified during the evidentiary hearing that no one he communicated with, including Brooks, indicated that Brooks abused alcohol at the time of the murders.  Funk further noted that:

> Unfortunately or fortunately for [Brooks], he had a mom and dad that loved him and a supportive family [as he] went through high school and the military.  I think he had some alcohol—like a DUI or drinking in the military, but to me nothing earth shattering in terms of an exacerbation of some latent mental health defect or any behaviors or exhibiting anything that would reflect any significant head trauma, nor was any reported to us ever.

Dr. Eisenstein, a clinical psychologist, testified during the evidentiary hearing that he examined Brooks and concluded he exhibited signs of brain dysregulation, and suffered from chronic PTSD and alcohol abuse.  Dr. Eisenstein additionally testified that Brooks was suffering from an extreme emotional or

- 42 -

mental disturbance and lacked the ability to conform his conduct to the requirements of law. However, Dr. Eisenstein admitted that Brooks was generally uncooperative during clinical testing and did not provide his best effort. In fact, Brooks ended the first day of psychological testing early, and refused to see Dr. Eisenstein when the doctor returned on a second day to conduct additional testing.[8] As a result, Dr. Eisenstein conceded during cross-examination that his diagnoses were tentative and were undermined by Brooks' decision to not cooperate during the evaluation process. The State further challenged Dr. Eisenstein's conclusions that Brooks was incapable of conforming his conduct to the requirements of law:

> STATE: Just as you didn't speak to any of the witnesses whose presence he was in that night or that early morning about his condition as far as the use of alcohol, you haven't spoken with any of them or considered their accounts as to whether he exhibited any behavior that was abnormal during the night of the murders or the early morning after?
>
> DR. EISENSTEIN: Correct.
>
> STATE: Wouldn't you find that helpful to know what other persons say, this is how he looked that night, in forming [your opinion that Brooks was unable to conform his conduct to the requirements of law]?
>
> DR. EISENSTEIN: Yes, that would have been helpful.
>
> STATE: Was it something you asked for and weren't given, or something you just did not ask for?

---

8. Brooks was not only uncooperative with Dr. Eisenstein, but he also completely refused to be evaluated by the State's expert.

. . . .

DR. EISENSTEIN: I didn't ask for it, no.

As noted above, when reviewing whether a defendant has established prejudice on a claim alleging ineffectiveness for the failure to present mitigation, this Court considers the totality of the available mitigation evidence—both that adduced at trial and during the evidentiary hearing—and reweighs it against the evidence in aggravation. Simmons, 105 So. 3d at 503. Here, the evidence presented in aggravation is significant. The trial court found four aggravating circumstances for the murder of three-month-old Stuart, and five aggravating circumstances for the murder of Carlson, including HAC and CCP. Similar to mitigation found by the trial court during the penalty phase, the mitigation Brooks presented during the evidentiary hearing pales in comparison to this overwhelming aggravation. While Brooks presented evidence that he suffered from alcohol abuse after his discharge from the military, he failed to present any evidence linking his alcohol abuse to his life and conduct. Dr. Eisenstein's testimony regarding mental health mitigation was not only extensively impeached, but its value was significantly diminished by Brooks' failure to cooperate.

Thus, we conclude that: (1) Brooks waived the presentation of mitigation; (2) Brooks' trial counsel conducted a reasonable investigation into available mitigation; and (3) the evidence presented by Brooks during the evidentiary

hearing does not create a reasonable probability sufficient to undermine confidence in the outcome of his sentences. Trial counsel did not perform ineffectively, and the postconviction court did not err when it denied this claim.

## Newly Discovered Evidence

To obtain relief based on a claim of newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known, and it must appear that the evidence could not have been known through the use of due diligence. See Jones v. State, 709 So. 2d 512, 521 (Fla. 1998). Second, the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial. Id. Newly discovered evidence satisfies the second prong of this test if it weakens the case against a defendant so as to give rise to a reasonable doubt as to his or her culpability. Id. at 526. In determining whether a new trial is warranted, the reviewing court must consider all newly discovered evidence which would be admissible, and evaluate the weight of both the newly discovered evidence and the evidence which was introduced during trial. See id. at 521. This determination includes an evaluation of whether: (1) the evidence goes to the merits of the case or constitutes impeachment evidence; (2) the evidence is cumulative to other evidence presented; (3) there are any inconsistencies in the newly discovered evidence; and (4) the evidence is material and relevant. Id.

When a postconviction court rules on a newly discovered evidence claim after an evidentiary hearing, this Court will affirm those determinations that involve findings of fact, the credibility of witnesses, and the weight of the evidence provided they are supported by competent, substantial evidence. Melendez v. State, 718 So. 2d 746, 747-48 (Fla. 1998); Blanco v. State, 702 So. 2d 1250, 1251 (Fla. 1997). As with other postconviction claims, this Court reviews the postconviction court's application of the law to the facts de novo. Hendrix v. State, 908 So. 2d 412, 423 (Fla. 2005).

During the second evidentiary hearing, Brooks presented Ferguson, who testified that he saw Carlson with Gundy between 10:30 and 11 p.m. on the night of the murders. If true, this testimony would be beneficial to Brooks because evidence presented during trial appeared to conclusively demonstrate that at 10:20 p.m., Brooks and his codefendant were located inside a vehicle that was detained by law enforcement several miles from the crime scene. Although the postconviction court found the first prong of the newly discovered evidence test had been satisfied, in its order it concluded that Ferguson's testimony was "thoroughly impeached by the State," and "not worthy of belief," explaining:

> Mr. Ferguson testified that he learned of Rachel Carlson's murder the day after the crimes, in 1996, but did not report his account of seeing her with Gerrold Gundy until 2010. The Court finds this lengthy delay in coming forward with this information regarding a brutal double homicide to be one factor in the Court's conclusion that Ferguson's testimony is not credible.

- 46 -

The Court further notes that Ferguson's handwritten affidavit does not contain the date of the crime, although the affidavit contains specific time frames. Glenn Swiatek, former attorney for co-Defendant Walker Davis, Jr., testified that when he was attending the deposition of Ferguson, prior to the deposition, Ferguson asked him what was the date of the crime. After Mr. Swiatek told him April 24, 1996, Ferguson wrote that date on the top of his affidavit. Ferguson's explanation for this action was that he was essentially "testing" Mr. Swiatek. The Court finds this explanation not credible.

. . . .

Mr. Ferguson testified that, on the night of the murder, he went to the residence of "Michelle" in Panama City, Florida. In his deposition, Ferguson testified that he could not remember Michelle's last name. Yet, an investigator working for the Defendant's counsel testified at the evidentiary hearing that the investigator was provided the name Michelle Roberts. The investigator testified he could not locate the "Michelle Roberts" in question.

Mr. Ferguson testified that he was an associate of Gerrold Gundy. However, Mr. Gundy also testified at the evidentiary hearing that he could not say he knew Mr. Ferguson. Mr. Gundy's testimony reflected that he was not an associate of Ferguson. The Court finds Gundy's testimony that he was not an associate of Ferguson's to be credible. As Mr. Funk testified at the March 2012 evidentiary hearing, having a witness such as Mr. Ferguson would only be helpful if he was believable and credible. Otherwise, such a witness could undercut all of the efforts of the defense. The Court finds that the testimony of Mr. Ferguson, if he were to testify on a retrial, would do just that.

(Citations and footnotes omitted.) Thus, the postconviction court concluded that

Ferguson's testimony was not credible, it would undercut the defense and would

probably not produce an acquittal on retrial, and denied relief.

On appeal, Brooks contends that the conclusion of the postconviction court

that Ferguson was not credible was incorrect for three reasons. First, Brooks

contends that independent corroborating evidence supports Ferguson's testimony, thereby proving that Gundy testified untruthfully about his whereabouts on the night of the murders. During the evidentiary hearing, Ferguson testified that he saw Gundy with Carlson at a club on the night she was murdered. Gundy disputed that fact and testified that he did not know Carlson, and that he did not go to the club on the night of the murders. However, Brooks notes that a witness told police Gundy was at the club at 10:30 p.m. that evening. Second, Brooks contends that the postconviction court erroneously relied upon the fact that Ferguson was a convicted felon and ignored Gundy's eight felony convictions, including convictions for crimes of dishonesty. Finally, Brooks alleges that the postconviction court ignored the fact that only Gundy, and not Ferguson, had a motive to present false testimony.

Brooks mischaracterizes the postconviction court's ruling on his newly discovered evidence claim as being based solely upon a finding that Gundy was a more credible witness than Ferguson. That assertion is not supported by the facts. As evidenced by the detailed discussion previously quoted, the postconviction court relied on Gundy's testimony as only one of many factors to conclude that Ferguson's testimony was not credible. In fact, the postconviction court mentioned Gundy's credibility only <u>once</u> in this section of the order. The court limited its reliance on Gundy's testimony to find only that Gundy was being truthful when he

- 48 -

testified that <u>he did not know Ferguson</u>.  The court also extensively detailed the factors that led it to conclude that Ferguson's testimony was not credible. Specifically, the postconviction court relied on Ferguson's inability to remember the date of the crime, and that no witness or any other independent evidence corroborated the only critical portion of Ferguson's testimony, which was that he saw Carlson and Gundy <u>together</u> at Club Rachel on the night of the murders.

Further, we have previously stated that courts may consider both the length of the delay and the reason the witness has failed to come forward sooner in evaluating newly discovered evidence claims.  <u>Jones</u>, 709 So. 2d at 521-22.  Here, the postconviction court noted that Ferguson waited nearly <u>fifteen years</u> before reporting this information to law enforcement, and his explanation for not disclosing this evidence sooner was that he was not "a law enforcer."  We conclude that the postconviction court's determinations that Ferguson's testimony was not credible, would have been of little or no value to the defense, and would probably not have produced an acquittal on retrial are supported by competent substantial evidence, and we affirm the denial of this claim.

### Cumulative Error

Brooks contends that the cumulative effect of the <u>Strickland</u>, <u>Giglio</u>, and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), violations and his newly discovered evidence claim deprived him of a fair trial and undermines confidence in his

- 49 -

convictions and sentences. While Brooks contends that this Court should consider the alleged Brady errors in conjunction with his Strickland, Giglio, and newly discovered evidence claims, he has presented no argument on appeal to support the allegation that a Brady violation occurred. Although Brooks presented a Brady challenge below, his discussion of Brady on appeal was presented primarily in a footnote, in which he stated that:

> Although the facts underlying Mr. Brooks' claims are raised under alternative legal theories—i.e., Brady, Giglio, and ineffective assistance of counsel—the cumulative effect of these facts in light of the record as a whole must nevertheless be assessed. As with Brady error, the effects of the deficient performance must be evaluated cumulatively to determine whether the result of the trial produced a reliable outcome.

This Court has previously held that vague and conclusory allegations on appeal are insufficient to warrant relief. Heath v. State, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Heath has waived his cumulative-error claim because his brief includes no argument whatsoever and instead consists of a one-sentence heading in his brief."); see also Doorbal v. State, 983 So. 2d 464, 482-83 (Fla. 2008) ("Doorbal neither states the substance of any of the claims that were summarily denied, nor provides an explanation why summary denial was inappropriate or what factual determination was required on each claim so as to necessitate an evidentiary hearing. We conclude that this general, conclusory argument is insufficient to

preserve the issues raised in the 3.851 motion, and, therefore, this claim is waived."). Accordingly, Brooks has waived his <u>Brady</u> claim.

We additionally conclude that Brooks is not entitled to relief under this claim because each of Brooks' allegations of error independently lacks merit. <u>Hurst v. State</u>, 18 So. 3d 975, 1015 (Fla. 2009).

## PETITION FOR WRIT OF HABEAS CORPUS

### Standard of Review

Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. <u>See</u> <u>Freeman v. State</u>, 761 So. 2d 1055, 1069 (Fla. 2000). To determine whether a claim alleging ineffective assistance of appellate counsel warrants habeas relief, we evaluate: (1) whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance; and (2) whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result. <u>Pope v. Wainwright</u>, 496 So. 2d 798, 800 (Fla. 1986); <u>see also</u> <u>Lynch v. State</u>, 2 So. 3d 47, 84-85 (Fla. 2008). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." <u>Freeman</u>, 761 So. 2d at 1069; <u>see also</u> <u>Knight v. State</u>, 394 So. 2d 997, 1001 (Fla. 1981).

## Analysis

## Inconsistent Theories

In his first habeas claim, Brooks contends that his appellate counsel performed ineffectively in two ways. Brooks first contends that his appellate counsel performed ineffectively when he failed to present a due process claim pursuant to Bradshaw v. Stumpf, 545 U.S. 175, 187-88 (2005). Brooks asserts that the prosecution presented inconsistent theories of who the "knifeman" was during Brooks' and Davis' trials. To support this contention, Brooks claims that during Davis' trial, the prosecution maintained that "at a minimum, it was unclear as to who was the actual killer." Further, Brooks contends the prosecutor made several statements indicating that Davis orchestrated the plan to murder Carlson and Stuart. Brooks further alleges that during the closing statements of Davis' trial, the State urged the jury to recommend death sentences, even if Davis were not the killer, because Davis was a principal actor and was responsible for both murders. Brooks contends that this "ambiguity" regarding who was the "knifeman" vanished during his trial when the prosecution elicited testimony that: (1) Brooks was sitting in the backseat of Carlson's vehicle; and (2) whoever was sitting in the backseat of the vehicle killed Carlson and Stuart. Accordingly, Brooks asserts his due process rights were violated when the trial court relied on factual findings developed

during his trial to impose sentences of death that were contradicted by the testimony and argument presented during Davis' trial.

The State contends that this Court should deny this claim based on <u>Raleigh v. State</u>, 932 So. 2d 1054, 1065-67 (Fla. 2006).  In <u>Raleigh</u>, the defendant alleged in his postconviction motion that the State violated his right to due process under <u>Stumpf</u> by taking inconsistent positions during his trial and his codefendant's trial regarding the identity of the "principal actor" in the murder.  <u>Id.</u> at 1065.  This Court denied the claim, concluding that the due process concerns presented in <u>Stumpf</u> did not apply because the prosecutor in <u>Raleigh</u> did not take an inconsistent position, as the prosecution did in <u>Stumpf</u>.  <u>Id.</u> at 1067.

Similar to the claim presented in <u>Raleigh</u>, the prosecutor here did not present inconsistent positions during Brooks' and Davis' trials.  While there is no dispute that the prosecutor attempted to establish that Brooks was the "knifeman" during Brooks' trial, he did not attempt to establish that Davis was the "knifeman" during the Davis trial.  In fact, the prosecutorial statements from the Davis trial indicate that the State actively sought the death penalty for Davis by relying almost exclusively on the fact that Davis orchestrated the plan to murder Carlson and Stuart.  In other words, it was the State's position that Davis was the mastermind who requested that Brooks assist him with his plan to murder Carlson and Stuart.  Thus, unlike the situation in <u>Stumpf</u>, the State did not first attempt to establish that

Davis was the "knifeman" and then inconsistently prosecute Brooks as the "knifeman" for the same murders. See Stumpf, 545 U.S. at 180-81. Rather, the prosecution simply argued two different inferences from the same record.

Based on the foregoing, we hold that counsel's decision not to present a Stumpf due process claim does not constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance, and we deny this subclaim. See Valle v. Moore, 837 So. 2d 905, 908 (Fla. 2002) (noting that "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims on appeal").[9]

Proportionality

In the second portion of his first habeas claim, Brooks contends that his appellate counsel did not adequately contest the proportionality of the death sentences on direct appeal. Although Brooks does not dispute that his appellate counsel presented a proportionality challenge in his initial brief, his reply brief, and in a motion for rehearing, Brooks contends that counsel performed deficiently because he failed to incorporate additional evidence and arguments that were made

---

9. Furthermore, Stumpf was decided over two years after Brooks' appellate counsel filed his initial brief. This Court has made clear that counsel cannot be held ineffective for failing to anticipate changes in the law. Taylor v. State, 62 So. 3d 1101, 1111 (Fla. 2011). In Walton, this Court expressly held that Stumpf did not recognize a new fundamental constitutional right that applies retroactively. Walton v. State, 3 So. 3d 1000, 1005 (Fla. 2009).

- 54 -

during Davis' trial. According to Brooks, this evidence and these arguments would have established that his sentence should be reduced because Davis, who was sentenced to life imprisonment, was equally culpable.

In the initial brief on direct appeal, Brooks' counsel comprehensively attacked the trial court finding that Brooks was more culpable than Davis:

> Davis not only was the prime instigator for the murders, he was the one who had laid the foundation for Carlson's and Alexis' deaths long before Brooks entered the picture. He initiated the murder plot, he was its mastermind, and he kept it going after the repeated aborted attempts.
> Brooks may have been the one who killed but Davis had at least an equal culpability with him, and more reasonably he deserved greater blame than the defendant. Yet this co-defendant received a life sentence. Clearly, he could have received a death sentence, but he did not. And however much Brooks may deserve to die, this Court must reduce his death sentences to life imprisonment because when the trial judge imposed a life sentence on Davis it limited the punishment it could impose on Brooks. His culpability was no greater than Davis' and for that reason, he could not be sentenced to death. In short, but for Davis, Carlson and Alexis would be alive today, and Brooks would [be] a free man. A death sentence for this defendant is proportionately unwarranted.

(Citations omitted.) In his reply brief, counsel contended, "it is clear that the case for aggravation applies as equally to Davis as to Brooks."

This Court considered and rejected these arguments in a lengthy analysis. We determined the trial court's finding that Brooks was more culpable because he not only participated in the planning of the murders, but actually carried out the plan by fatally stabbing each of the victims, was supported by competent,

substantial evidence. Brooks II, 918 So. 2d at 209. Thus, we concluded that "[c]ontrary to Brooks' assertion, disparate treatment of Brooks as the 'knifeman' in the instant case is warranted," because Brooks was more culpable than Davis in the murders. Id.

Under nearly identical circumstances, this Court has previously denied similar claims that attempt to reargue proportionality as procedurally barred. See Lawrence v. State, 969 So. 2d 294, 315 (Fla. 2007) (denying as procedurally barred a habeas claim alleging ineffective assistance of appellate counsel for failing to present certain arguments as to why the sentence of death was inappropriate); see also Zack v. State, 911 So. 2d 1190, 1210 (Fla. 2005) (denying a claim as procedurally barred where claim "simply refashions a claim that was unsuccessfully raised on direct appeal"); Rutherford v. Moore, 774 So. 2d 637, 645 (Fla. 2000) (holding that when a claim is presented on direct appeal, the Court will not consider a claim that appellate counsel was ineffective for failing to present additional arguments in support of the claim on appeal). Based on this precedent, we deny this claim as procedurally barred.

**Confrontation Clause**

In his second habeas claim, Brooks contends that his appellate counsel performed ineffectively when he failed to assert that the trial court violated his constitutional right to confrontation when the court limited the cross-examination

of several State witnesses. Brooks additionally contends that his appellate counsel performed ineffectively when he failed to challenge the presentation of the testimony of Dr. Michael Berkland.

Cross-Examination

For the third time, Brooks attempts to allege ineffectiveness arising from the decision not to present the evidence previously discussed—i.e., the green Nissan, Gerrold Gundy, the hair, the timeline, the polygraph, and the crime scene dog. Here, Brooks contends that his right to confrontation was violated when the trial court prevented trial counsel from cross-examining several State witnesses to elicit testimony regarding this evidence. He contends that the trial court's ruling, which limited the cross-examination of State witnesses to only issues that were addressed on direct examination, "touched the core of [his] defense and entirely cut off his opportunity to impeach the State's witnesses."

We conclude that this claim lacks merit for several reasons. First, the plain language of section 90.612(2), Florida Statutes, expressly provides trial courts with the discretion to expand cross-examination beyond the subject matters discussed during direct examination. § 90.612, Fla. Stat. (2002) ("Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court <u>may, in its discretion</u>, permit inquiry into additional matters.") (emphasis supplied). Thus, pursuant to section

90.612(2), the trial court could have permitted the defense to cross-examine State witnesses on evidentiary matters that were outside the scope of direct examination, but it was not required to do so. Brooks appears to recognize that the decision not to permit additional cross-examination was within the trial court's discretion, as he does not contend that the trial court erroneously sustained the prosecutor's objections to questions that were outside the scope of direct examination. He also does not dispute that the testimony he sought to introduce was outside the scope of direct examination. Accordingly, we conclude that appellate counsel's failure to present a claim that the trial court erred in properly exercising its statutorily conferred discretion does not constitute deficient performance and certainly does not fall measurably outside the range of professionally acceptable performance.

Further, because Brooks does not dispute that the testimony he wished to present was outside the scope of direct examination, his only argument is that this testimony was critical to rebutting the State's case, and that his confrontation rights were violated when counsel was not permitted to cross-examine State witnesses in this manner. Brooks has failed to present any precedent demonstrating that the failure to permit a defendant to cross-examine witnesses on subject matters outside the scope of direct examination constitutes a constitutional violation. Thus, Brooks has not only failed to demonstrate deficiency, but he has also failed to establish that appellate counsel's failure to present this claim on direct appeal compromised

the appellate process to such a degree that confidence in the correctness of the result has been undermined. We deny this subclaim.

Dr. Berkland's Expert Testimony

During the retrial, the State presented Dr. Jody Nielson, who conducted an autopsy of the victims and testified to their injuries and cause of death. Later, Dr. Berkland provided his opinions on several topics including: the victims' injuries; the manner and cause of death; the depth of the wounds; and how and in what order the wounds were inflicted. Dr. Berkland's testimony, however, was not based upon an autopsy he conducted, but rather another autopsy performed by Dr. Joan Wood, who did not testify during trial. Brooks contends that his confrontation rights were violated when the State presented Dr. Berkland's testimony without first demonstrating that Dr. Wood was unavailable to testify.

This case is similar to the situation we addressed in Capehart v. State, 583 So. 2d 1009, 1012-13 (Fla. 1991). In Capehart, the defendant objected to a medical examiner testifying at trial regarding the cause of death and the condition of the victim's body because that doctor did not perform the autopsy. Id. at 1012. We held that under section 90.704, Florida Statutes (1987), a medical examiner may, in his or her expert testimony, rely on facts or data not in evidence because such information is of a type reasonably relied upon by experts in the field. Id. We held that the expert testimony was proper where the expert formed an opinion

based upon the autopsy report, the toxicology report, the evidence receipts, the photographs of the body, and all other paperwork filed in the case. Id. at 1013. Additionally, in Geralds v. State, 674 So. 2d 96 (Fla. 1996), we held it was proper to permit a medical expert to testify as to the cause of death, even though the expert did not perform the autopsy.

Here, the prosecutor specifically noted during trial that Dr. Wood was unavailable to testify due to health problems. Further, trial counsel did not object to Dr. Berkland's qualifications as an expert, nor does Brooks now contend that Dr. Berkland's testimony was not based upon an opinion that was developed after he independently reviewed autopsy protocols, diagrams, and photographs taken both during Dr. Wood's autopsy and at the scene of the murders. Thus, because Dr. Berkland's testimony was presented in a manner consistent with our precedent, appellate counsel cannot be deemed ineffective for failing to present this nonmeritorious claim on appeal. See Valle, 837 So. 2d at 908. Accordingly, we deny this subclaim.

**Impermissible Prosecutorial Comments**

In his third claim, Brooks contends that his appellate counsel performed ineffectively when he failed to challenge the prosecutor's impermissible comments, misstatements of the law, and attempts to inflame the jury. He further

claims that the comments independently and cumulatively jeopardized the fairness of his trial.

Burden Shifting

Brooks first contends that the prosecutor attempted to shift the burden to Brooks to prove his innocence in two ways. First, Brooks notes that during voir dire, the prosecutor told the jury with regard to the State's burden of proof: "It's not an easy concept to just rattle off what it means, but I'll tell you what's not in there. . . . The State is not required to prove its case one hundred percent." (Emphasis supplied.) Brooks contends that this statement "minimized the certitude" that is required by both the United States and Florida Constitutions before a defendant may be convicted of a crime.

We addressed a nearly identical claim in Morrison v. State, 818 So. 2d 432, 444 (Fla. 2002). In Morrison, the prosecutor stated during voir dire, "Do you all understand that you don't have to be 100 percent, absolutely convicted [sic] that this man committed the crime in order to return a verdict of guilty?" Similar to Brooks, the defendant in Morrison claimed that the prosecutor's remarks to the venire improperly minimized the State's burden of proof and violated Morrison's rights to a fair trial and due process. Id. We denied the claim, relying upon State v. Wilson, 686 So. 2d 569, 570 (Fla. 1996), to conclude:

> In Wilson, the trial judge made extemporaneous remarks to the venire regarding the State's burden of proof, including the following

statement: "I repeat, stress, and emphasize, the State does not have to convince you to an absolute certainty of the defendant's guilt. Nothing is one hundred percent certain." Wilson, 686 So. 2d at 570. We acknowledged that the trial judge's preliminary instruction on reasonable doubt in Wilson was "not incorrect, as such . . . [but] it was at least ambiguous to the extent that it might have been construed as either minimizing the importance of reasonable doubt or shifting the burden to the defendant to prove that reasonable doubt existed." Id. This Court, however, went on to say, "Notwithstanding, in view of the fact that the trial judge gave the standard jury instruction on reasonable doubt at the close of the evidence and told the jury that it must follow the standard instructions, we cannot say that error was committed." Id.

The instant case involves a remarkably similar extemporaneous remark made by the prosecutor to the venire regarding the State's burden of proof. As we stated in Wilson, although such a statement may not be technically incorrect, it may be at least ambiguous to the extent that it might have been construed as either minimizing the importance of reasonable doubt or shifting the burden to the defendant to prove that a reasonable doubt existed. However, like the trial court in Wilson, the trial court in the instant case gave the standard jury instruction on reasonable doubt at the close of evidence and told the jury it must follow the standard instructions. Given that the trial court in the instant case also instructed the venire to disregard the statement and read the standard reasonable doubt instruction to the venire immediately following the prosecutor's comment, as well as re-read the reasonable doubt instruction while swearing in the jury, it stands to reason that the curative actions taken in the instant case were at least as effective as those taken by the trial judge in Wilson. See Williams v. State, 674 So. 2d 155 (Fla. 4th DCA 1996) (holding any harm created by prosecutor's statement that State's burden was not to prove guilt to "100 percent certainty" was cured by the court's curative instruction coupled with the fact that the court subsequently correctly charged the jury).

Morrison, 818 So. 2d at 444-45. Here, the prosecutor was asked during voir dire whether it was the State's burden to prove "beyond a shadow of a doubt" whether an individual was a principal in a crime. The prosecutor responded in the negative,

- 62 -

explaining, "I'm going to tell you right now that the State has the burden in this case. The State willingly accepts that burden. The State must prove the guilt of Lamar Brooks beyond any reasonable doubt." The statement in question occurred later during the prosecutor's explanation, and was one isolated sentence in a nearly two-page response to the juror's inquiry, during which defense counsel did not object. After the jury was sworn, the trial court instructed the jury that it was their "solemn responsibility to determine if the [S]tate has proved its accusation beyond a reasonable doubt." The court then later, after closing statements, read the standard jury instruction on reasonable doubt to the jury.

We conclude that this case is materially indistinguishable from Morrison and Wilson, and had this claim been presented on appeal, it would have been rejected. Any ambiguity in the prosecutor's comments regarding the State's burden of proof was clarified satisfactorily when the trial court instructed the jury that the prosecutor's comments were not evidence and later read to the jury the standard instruction for reasonable doubt. Therefore, because appellate counsel cannot be deemed ineffective for failing to present nonmeritorious claims on appeal, we hold that this subclaim lacks merit. See Valle, 837 So. 2d at 908.

Second, Brooks contends that the prosecutor attempted to shift the burden of proof to him by improperly contending that there was no evidence connecting Gundy to the murders. It is true that the State may not comment on a defendant's

failure to present a defense because doing so could lead the jury to erroneously conclude that the defendant has the burden of doing so. However, a prosecuting attorney may comment on the jury's duty to analyze and evaluate the evidence presented during trial and may provide his or her opinion relative to what reasonable conclusions may be drawn from the evidence. Evans v. State, 838 So. 2d 1090, 1094 (Fla. 2002); Rodriguez v. State, 753 So. 2d 29, 28 (Fla. 2000). Here, the comments relating to Gundy were limited. They only conveyed that the prosecutor believed no evidence was presented during trial to link Gundy to the murders. This was a reasonable comment based on the evidence presented during trial, and the comments in no way bolstered the State's case or shifted the burden to Brooks to prove that he was innocent. Thus, we conclude that had this subclaim been presented on appeal, it would have been rejected. Accordingly, this subclaim lacks merit. See Valle, 837 So. 2d at 908.

Stabbing Gesture During Closing Statements

Brooks contends that the prosecutor attempted to inflame the jury during closing statements when he made a stabbing gesture in the air and raised his voice while he was counting the number of stab wounds inflicted on the victims. After the trial court instructed the jury, the prosecutor admitted that he engaged in this conduct because he was "demonstrating what [he] believed was done to the

victims." Brooks presents no precedent that demonstrates this type of prosecutorial behavior is improper.

In State v. Duncan, 894 So. 2d 817, 829-31 (Fla. 2004), we addressed a habeas claim alleging that appellate counsel was ineffective for failing to challenge the use of a dummy as a demonstrative aid during one eyewitness's testimony. During the State's case-in-chief, the prosecutor asked the eyewitness to demonstrate what he had observed through the use of a dummy. Id. at 829-30. Defense counsel objected to the use of the demonstrative aid, but the trial court overruled the objection. Id. On appeal, we noted that in Brown v. State, 550 So. 2d 527, 528 (Fla. 1st DCA 1989), the Fifth District held:

> Demonstrative exhibits to aid the jury's understanding may be utilized when relevant to the issues in the case, but only if the exhibits constitute an accurate and reasonable reproduction of the object involved. The determination as to whether to allow the use of a demonstrative exhibit is a matter within the trial court's discretion.

Duncan, 894 So. 2d at 829 (quoting Brown, 550 So. 2d at 528) (citations omitted). The prosecutor in Brown used a knife and a Styrofoam head during his closing statements to depict the extent of a victim's stab wounds. See 550 So. 2d at 528. The Fifth District concluded that the demonstrative aids were "sufficiently accurate replicas to be allowable within the court's discretion." Id. Relying upon the standard articulated in Brown, we concluded in Duncan:

> The dummy was used to aid the jury's understanding of a relevant issue, namely guilt, and there is no claim that the exhibit was not an

- 65 -

accurate and reasonable reproduction of the attack. Therefore, the determination as to whether to allow the use of a demonstrative exhibit was a matter within the trial court's discretion. The judge did not abuse his discretion in allowing the use of the demonstrative aid. Additionally, as in <u>Brown</u>, the overwhelming evidence of Duncan's guilt negates any reasonable possibility that his conviction resulted from the challenged demonstration.

<u>Duncan</u>, 894 So. 2d at 830-31.

Here, as in <u>Duncan</u>, Brooks does not contend that the reenactment was inaccurate or an unreasonable reproduction of what occurred. He instead asserts that it was used solely to inflame the emotions of the jury. However, as noted in <u>Brown</u>, it is within a trial court's discretion to allow the prosecutor to explain during closing statements what he reasonably believed would assist the jury in understanding the evidence that was presented during trial. <u>See</u> <u>Brown</u>, 550 So. 2d at 529. Furthermore, the "overwhelming amount of properly admitted evidence upon which the jury could have legitimately relied in finding Brooks guilty in the instant matter," negates any reasonable possibility that his conviction resulted from the challenged demonstration. <u>Brooks II</u>, 918 So. 2d at 194; <u>see also</u> <u>Duncan</u>, 894 So. 2d at 830-31. Thus, we conclude that this subclaim lacks merit, and appellate counsel was not ineffective for failing to present this claim on appeal.

Burden Shifting Regarding Sentencing

Brooks contends under this subclaim that appellate counsel performed ineffectively when he failed to assert that the prosecutor improperly shifted the

- 66 -

burden to Brooks to establish that life was the appropriate sentence. The prosecutor told the jury during penalty phase closing statements that "there are mitigating circumstances that you should consider and weigh against that aggravation, <u>and if you find that the mitigating circumstances outweigh the aggravating circumstances, then your vote should be for life</u>." (Emphasis supplied.)

We deny this claim for two reasons. First, the prosecutor's statement is consistent with both the standard advisory sentence jury instruction and section 921.141(2), Florida Statues (2002), which provides:

> After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
>
> (a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);
>
> (b) <u>Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist</u>; and
>
> (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

(Emphasis supplied); <u>see also</u> Fla. Std. Jury Inst. (Crim.) Homicide 7.11 ("Should you find sufficient aggravating circumstances do exist to justify recommending the imposition of the death penalty, it will then be your duty to determine <u>whether the mitigating circumstances outweigh the aggravating circumstances that you find to exist</u>.") (emphasis supplied). Second, this Court has consistently rejected claims

that section 921.141(2) and the standard jury instruction require a defendant to establish that life is the appropriate sentence. See, e.g., Wheeler v. State, 4 So. 3d 599, 611 (Fla. 2009). Thus, we conclude that this subclaim lacks merit.

## Conclusion

In sum, all of Brooks' claims of prosecutorial misconduct lack merit, and we therefore conclude that appellate counsel did not perform ineffectively by failing to present these claims on direct appeal.

## Prejudicial Photographs

In his final claim, Brooks alleges that appellate counsel performed ineffectively when he failed to challenge the admission of over thirty-five photos, many of which he claims were gruesome, duplicative, and not relevant. This Court has consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield v. State, 758 So. 2d 636, 648 (Fla. 2000). Photographs are admissible if they assist in explaining the nature and manner in which wounds were inflicted. Bush v. State, 461 So. 2d 936, 939 (Fla. 1984). Moreover, photographs are admissible to show the manner of death, the location of wounds, and the identity of the victim. Larkins v. State, 655 So. 2d 95, 98 (Fla. 1995). While trial courts must be cautious and not permit unduly prejudicial or particularly inflammatory photographs before the jury, a photograph will not be excluded as unduly prejudicial simply because the content

depicted in the photograph is gruesome.  See Hampton v. State, 103 So. 3d 98, 115 (Fla. 2012).  Finally, the admission of photographic evidence of a murder victim is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent an abuse of discretion.  See id.

During Brooks' second trial, the State sought the admission of several additional photographs and one video.  Brooks does not specifically explain why the photographs were too gruesome, but rather alleges that the State presented too many photos that were duplicative and inflammatory.  However, the fact that several similar photographs were presented does not demonstrate that the trial court erred in admitting them.  The photographs and video were used either by the medical examiners or crime scene technicians to assist in explaining the condition of the crime scene, the position and location of the bodies, and the manner and cause of death, and were therefore directly relevant to several disputed issues of fact.  We have previously held a trial court's admission of similar photos not to be an abuse of discretion.  See Bush, 461 So. 2d at 939 (noting that photographs are admissible if "they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted"); see also Larkins, 655 So. 2d at 98 (explaining that photographs are admissible "to show the manner of death, the location of wounds, and the identity of the victim.")

Moreover, Brooks' counsel challenged the admission of five photographs on direct appeal, alleging that the probative value of the photos was substantially outweighed by their prejudice. Brooks I, 787 So. 2d at 781. We rejected the claim and concluded that the trial court did not abuse its discretion in admitting the photographs because they were relevant to the medical examiner's determination as to the manner of Carlson's death. Id. It is, therefore, reasonable for appellate counsel to conclude, based on our previous holding during the first direct appeal that the trial court did not err in admitting several photographs that Brooks claimed were too gruesome and prejudicial, that this Court would again reject a similar claim when the photographs were presented in substantially the same manner. Thus, we conclude that Brooks has failed to establish any unfair prejudice associated with the admission of these photographs. The trial court did not abuse its discretion in admitting the photographs, and if Brooks had presented this claim on appeal, it would have been rejected. This claim, therefore, lacks merit, and appellate counsel cannot be deemed ineffective for failing to present it. See Valle, 837 So. 2d at 908.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's order denying postconviction relief on all claims. We also deny the petition for writ of habeas corpus.

It is so ordered.


LABARGA, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and PERRY, JJ., concur.
QUINCE, J., concurs in result only.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Okaloosa County,
        Kelvin Clyde Wells, Judge - Case No. 461996CF000735XXXAXX
And an Original Proceeding – Habeas Corpus

Linda McDermott of McClain & McDermott, P.A., Estero, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Charmaine Millsaps, Assistant Attorney General, Tallahassee, Florida,

        for Appellee/Respondent